ROBERT BARNWELL RHETT, PLAINTIFF IN ERROR, *v.* ROBERT F. POE, CASHIER OF THE BANK OF AUGUSTA, DEFENDANT.(*a*)

Where the drawer of a bill has no right to expect the payment of it by the acceptor: where, for instance, the drawer has withdrawn, or intercepted, funds which were destined to meet the bill, or its payment was dependent upon conditions which he must have known he had not performed, such drawer cannot claim to be entitled to notice of the non-payment of the bill.

It becomes a question of law, whether due diligence has or has not been used, whenever the facts are ascertained; and therefore there is no error in the direction of a court to the jury that they should infer due diligence from certain facts, where those facts, if found by the jury, amounted in the opinion of the court to due diligence.

If the drawer and acceptor are either general partners or special partners in the adventure of which the bill constitutes a part, notice of the dishonour of the bill need not be given to the drawer.

---

(*a*) This case, although subsequent in this volume to that of Lawrence *v.* McCalmont, was in fact decided before it; having been argued at the preceding term and held under a *curia advisare vult;* and the manuscript opinion in the present case was sent for and referred to, during the progress of the argument in that of Lawrence *v.* McCalmont. The reason for stating this may be easily seen by referring to the report of that case.

Rhett *v.* Poe.

A court is not bound to grant an instruction prayed for, where it is merely a recital of general or abstract principles, and not accompanied by, or founded upon, a statement of the testimony.

The strictness of the rule requiring notice between parties to a bill, is much relaxed in cases of collateral security, or of guarantee in a separate contract; the omission of such strict notice does not imply injury as a matter of course. The guarantor must prove that he has suffered damage by the neglect to make the demand on the maker and to give notice, and then he is discharged only to the extent of the damage sustained.

THIS case came up by writ of error to the Circuit Court of the United States for the district of South Carolina.

The suit was brought in the court below, by Poe, the cashier of the bank, against Rhett as the endorser upon a note for $8000 under the following circumstances:

Dixon Timberlake was a merchant who, it appeared from the evidence, had been for several years prior to 1837, in the habit of going from New York to the south, during the cotton buying season, and then returning to New York. In the winter of 1836–7, he was at Augusta, in Georgia, with large letters of credit from various houses in New York, and also one from Benjamin R. Smith, then a merchant in Charleston, South Carolina. By the aid of these letters he acquired a credit at the Bank of Augusta, and purchased considerable quantities of cotton and some bank and other stocks in the course of the season. Some of these purchases were upon the joint account of Smith and himself, but the evidence was contradictory as to the particular purchases thus made.

In February and March, 1837, Timberlake, being in Augusta, drew several bills upon Smith in Charleston, which all became due in May. The whole amount of the bills thus due in May, was $21,500. A separate bill for $14,000 is not included amongst these, because it was paid.

This sum of $21,500 was divided into two classes; one class consisting of $8000 and the other of $13,500.

It appeared by the evidence, that Smith was to provide for the first class of $8000, and Timberlake for the remaining $13,500.

In order to carry out the arrangement respecting the first class, a bill was discounted drawn by Timberlake upon Smith for $8000, and the note which was the subject of the present suit offered and accepted as collateral security. The note was as follows:

Rhett *v.* Poe.

$8000.                              *Charleston, May 9th,* 1837.

Sixty days after date, I promise to pay to W. E. Haskell, or order, eight thousand dollars, for value received:

BENJAMIN R. SMITH.

Endorsed, W. E. HASKELL, per attorney B. R. SMITH.

R. BARNWELL SMITH, per attorney, B. R. SMITH.

R. Barnwell Smith, whose name it was admitted was placed upon the note by proper authority, was the same person as R. Barnwell Rhett, his name having been changed after the time of the endorsement.

Timberlake having made no provision for the other class of bills, amounting to $13,500, Smith was unable to take them up, and they were protested.

On the 2d of June, Smith made an assignment of his property for the benefit of his creditors, in a certain order which it is unnecessary to state; and it was further proved that at and before the maturity of the note on which the action was brought, Benjamin R. Smith was insolvent.

On the 11th of July, both the bill drawn by Timberlake upon Smith for $8000, and the note in question for $8000, became due; but neither being paid, the note was regularly protested and certain proceedings had upon the bill which constitute the defence in this case, where suit is brought upon the note.

It was given in evidence on the part of the plaintiff, in order to establish the regularity of the proceedings with regard to the bill, that the notary demanded payment at the store of Smith, the acceptor, and his clerk (Smith being absent) replied, " there were no funds for paying the same;" that the notary thereupon protested the bill for non-payment, and enclosed the notice thereof for Timberlake, the drawer, in a letter sent by mail, addressed to Robert F. Poe, the cashier of the Bank of Augusta, as was the custom in similar cases; that the notary, at the time when he protested the draft, did not know where Timberlake was to be found; that he had heard that he had resided and done business at Augusta, but was told that he had left that place. That he had made inquiries for Timberlake, and was then told that he had left Augusta, and it was not known where he had gone to. That the discount clerk of the Bank of Augusta had it in charge, as a part of his business, to make diligent search for the parties upon whom notices were to be served; that such notices were served upon them, personally, by said clerk if they were in Augusta,

and transmitted to them through the post-office if they were at a distance; that said clerk was in Augusta on the 11th of July, 1837, and believes the notice would have been served on Timberlake if he had been in Augusta; that said clerk has searched for the notice to Timberlake and cannot find it; that Timberlake lived in a boarding-house whilst in Augusta; that he was insolvent when said bill became due. It was further testified by the postmaster and his assistant, that two or more letters were received at the post-office for Timberlake during the summer after he had left Augusta, which were not advertised; that he leased a box at the post-office, for a time which did not expire until the 1st of October, 1837, into which his letters were placed; that such letters could not have been forwarded to the general post-office, because they were not advertised; that Timberlake left Augusta on the 30th June, 1837, in the public stage; and that he left no agent in Augusta.

On the other hand, it was given in evidence on the part of the defendant, upon the cross-examination of Timberlake himself in this case, that Timberlake left Augusta on the 30th June, having requested the postmaster to forward his letters after him, and that he received several letters, forwarded from Augusta, agreeably to his directions, but never received any letter or notice of the non-payment of the bill.

The defence rested chiefly on the ground, that proper diligence had not been used to give notice to the drawer of the dishonour of the bill, and that, consequently, the securities upon the note which was given collaterally, were exonerated from its payment.

In the trial of the cause in the court below, two separate sets of instructions were prayed for, on behalf of Rhett the defendant. The first set consisted of two prayers, which were refused by the court and were as follows:

1st. That by omission to inquire for the residence of Timberlake, or to send notice after him, the plaintiff has lost his right of action against him as drawer of the bill for $8000.

2d. That if the jury find that the note was given as collateral security for the bill drawn by Timberlake; and that Timberlake is discharged, then the plaintiff cannot recover against the defendant on the note sued upon.

The second set of instructions consisted of five prayers which the court were asked to grant, but the court refused to do so, with the exception of the fourth, and gave its own instructions to the jury. The prayers and instructions given are as follows:

Rhett *v.* Poe.

And the defendant, by his counsel, before the jury retired from the bar, further prayed the court to instruct the jury as follows:

1st. The parties having shown, that Timberlake had drawn upon Smith four bills, amounting in all to $21,500, which Smith had accepted, and had, at the time of the acceptance of the said bills, $10,000 in hand, received of Timberlake, to meet those bills, the defendant prayed the court to instruct the jury, that if the evidence was believed, then Timberlake had funds in the hands of Smith, and was entitled to notice.

2d. The defendant having shown that Timberlake resided in New York, and came habitually, between the months of October and January, to Augusta, and resided in Augusta during the winter and spring, and that Timberlake left Augusta on the 30th June, 1837, and that the notice of non-payment of the draft was forwarded by the notary in Charleston, to the plaintiff, on the 11th July, 1837, and nothing was shown to prove that the plaintiff had made any inquiry after Timberlake, or endeavoured to give him notice.

The defendant prayed the court to instruct the jury that the plaintiff had not used due diligence to give the drawer notice.

3d. And inasmuch as evidence had been given, that the bills drawn by Timberlake on Smith, were drawn for purchases of cotton or stock, on the joint account of Smith and Timberlake, and Timberlake had diverted the property purchased on joint account to his own use, and was therefore bound to provide for the bills which fell due in May, to the amount of $13,500, and had not done so; the defendant prayed the court to instruct the jury, that the default of Timberlake to take up the bills for $13,500, did not excuse the want of notice to make him liable on the bill for $8000.

4th. And the defendant prayed the court to instruct the jury, that if Timberlake had effects at any time between the drawing and the maturity of the said bill, in the hands of Smith, he was entitled to notice.

5th. The defendant prayed the court to instruct the jury, that the insolvency of the acceptor and drawer, before the maturity of the bill, did not excuse the holder from giving notice of non-payment to the drawer.

And the court instructed the jury as follows: On the first instruction asked, the court instructed the jury, that if they believed from the evidence, that Timberlake had in the hands of Smith, when Smith accepted the bill for $8000, $10,000, that Timberlake was entitled

2 Q 2

Rhett v. Poe.

to notice of the dishonour of the bill from the holder. But if the jury also believe from the evidence, that the $10,000, in the hands of Smith, was a fund raised upon Smith's letter of credit to Timberlake, and was to be applied to the payment of purchases on joint account, and had been so applied, and that there was an arrangement afterwards between Timberlake and Smith in respect to all the bills drawn by Timberlake, amounting to $21,500; that Timberlake was to put Smith in funds to pay bills to the amount of $13,500, of the $21,500, which were to become due before the bill of $8,000 became due, and that on Timberlake doing so Smith was to pay the $8,000 bill; and that Timberlake did not put Smith in funds to pay the $13,500, and that the same were protested, of which Timberlake had notice; then, that Timberlake had no right to notice of the non-payment of the $8,000 bill from the holder.

On the second instruction asked, the court instructed the jury, that if they believe from the evidence, that Timberlake resided in New York, and was a sojourner in Augusta, from time to time, as stated in the instruction asked, that then, as drawer of the bill, he was entitled to notice of its dishonour; but if the jury believe from the evidence, though he may have resided in New York, that he had made Augusta his residence since the fall of 1834 or 1835, and that he had removed from Augusta, and out of the state of Georgia, after the bill for $8,000 was drawn, and before its maturity, that then due diligence had been used to give him notice of the dishonour of the bill.

On the third instruction asked, the court instructed the jury, that if they believe from the evidence, that the bills drawn by Timberlake upon Smith, were drawn for purchases of cotton or stock on the joint account of Smith and Timberlake, and that Timberlake had diverted the property purchased on joint account to his own use, and that after promising Smith, the acceptor, to take up the bills to the amount of $13,500, he had failed to do so, and had not supplied Smith with money to take up the bills for $13,500, after the same were dishonoured, up to the time when the $8,000 draft became due; and that there was an arrangement between Timberlake and Smith, after the $8,000 bill was accepted, that Timberlake was to put Smith in funds to take up the drafts for $13,500, which had been dishonoured, and did not do so, that Timberlake was not entitled to notice of the dishonour of the bill for $8,000.

To the fourth instruction asked, the court instructed the jury, if

Rhett *v.* Poe.

they believe from the evidence, that Timberlake had effects in the hands of Smith at any time between the drawing of the bill, and the maturity of the said bill, that he was, as drawer, entitled to notice.

To the fifth instruction asked, the court instructed the jury, that the insolvency of the drawer and the acceptor, before the maturity of the bill, did not excuse the holder of the bill from giving notice of non-payment to the drawer. But the court further instructed the jury, that if the insolvency of the drawer and acceptor were known to each other, and that this bill was drawn to pay for a purchase on joint account, or a transaction in which they were partners, and that the property so purchased had been diverted by the drawer to his own use, and that the payment of all the bills had been the subject of private arrangement between the acceptor and the drawer, that then the holder was excused from giving notice of the non-payment of the bill for $8,000.

Whereupon, the said counsel, on behalf of the said defendant, before the jury retired from the bar, excepted to the aforesaid opinion and charge of the court, on the first, second, third, and fifth instructions moved for, and now excepts, and prays the court to sign and seal this bill of exceptions, which is done accordingly, this nineteenth day of April, in the year eighteen hundred and forty-one.

JAMES M. WAYNE, [L. S.]<br>R. B. GILCHRIST. [L. S.]

The jury found a verdict for the plaintiff for $8000, with interest from the 11th July, 1837.

To review all these prayers and instructions, the writ of error was brought.

*Coxe* and *Legare*, (attorney-general,) for the plaintiff in error.
*Wilde* and *Hunt*, for the defendant.

*Coxe*, for the plaintiff in error, said two questions naturally arose in the case.

1. Is Timberlake discharged?
2. If he is, what is the effect upon Rhett?

Mr. *Coxe* reviewed the evidence in order to show that Timberlake had provided sufficiently for the draft of $8000, as he thought; and that it was charged to Smith and not to Timberlake, in his account with the bank. He then argued that Rhett, being a collateral security, was entitled to all the rights of a party; that Timberlake's obligation to pay arose only in case the acceptor did not, and he, Timber-

lake, was duly notified of such failure; that he was not notified for a year; that the bank never served the notice, which it was bound to do. Chitty on Bills, ed. of 1839, p. 465, ch. 10, sect. 1, where the cases are collected. (See note.) The holder must give notice to all parties. 3 Taunt. 130.

It is true that the cases recognise a distinction between an endorsement upon the bill itself and an engagement in a separate contract. But no case justifies the extent of the doctrine which must be contended for by the other side.

As to the second instruction, there was no evidence that Timberlake had made Augusta his residence; and even if there was, the notice should have been sent after him to New York. Another state is not a foreign country. He did not abscond; he went away in company with one of the officers of the bank, and was with another of them, at the Sulphur Springs. There is no evidence that it was a partnership debt. The books say, it is dangerous not to give notice. Our remedy must not be impaired; separate notices ought to be given to all the parties. Chitty, 466. Our remedy against Timberlake has been impaired by the course pursued.

The first instruction of the court modified the prayer by adding, "if the fund was raised by Smith's letter of credit to Timberlake;" but, these funds do not appear to have been raised in this way. The evidence is to the contrary. It said also, that if Timberlake failed to take up his share, viz. $13,000, then Smith was exonerated from his agreement as made between them. But suppose this so, does this excuse the bank? A suit would have been necessary, which the bank had no right to anticipate. It is always inferred that a drawer has funds in the hands of a drawee and had a right to draw. 1 Term Rep. 416; 20 Johns. 485, 486.

If there is a reasonable expectation that a bill will be paid, the drawer is entitled to notice. 2 Campb. 461; 12 East, 433, S. C.; Chitty, 487.

The holder must use reasonable diligence to discover the residence of the endorser; but here there was no effort at all. They might have learned at the post-office where Timberlake's letters were sent to. 2 Peters, 96; Chitty, 488, A.; 3 Greenleaf, 83; 8 Pick. 251.

*Wilde,* for defendant in error.

The plaintiff in error contends:

1. That due notice of the non-payment of the bill was not given to Timberlake, the drawer, and therefore Timberlake was discharged.

Rhett *v.* Poe.

2. That his undertaking being only collateral to that of Timberlake, the discharge of Timberlake releases him.

And to this effect he prayed the first and third instructions.

To this it is replied on the part of the defendant in error:

1st. That there was actual notice to Timberlake or, due diligence to give such notice. [Mr. *Wilde* here entered into a critical review of the testimony, and inferred that,] there were before the jury sufficient facts to warrant them in finding actual notice. If the evidence falls short of establishing actual notice, still due diligence is abundantly proved. When the facts are ascertained and undisputed, what shall constitute due diligence is a question of law. 1 Peters, 583; Chitty on Bills, ed. 1817, p. 226, where it is said, (quoting the words of Lord Ellenborough in Walwyn *v.* St. Quentin,) when the holder of a bill does not know where the endorser is to be found, it would be very hard if he lost his remedy for want of immediate notice.

English Cases.—12 East, 433; Cowen, 81; Wightwick, 76.

American Cases.—1 Johns. Rep. 294; 3 Johns. Rep. 376; 5 Binney, 541; 4 Serg. and Rawle, 480. Other American cases collected in Bayley on Bills, 176, 183, notes; also, 5 Wendell, 587; 21 Wendell, 643; 24 Wendell, 230; 4 McCord, 503; 3 McCord, 394; 2 Wash. C. C. R., 191. The decision in the last case was sustained in 10 Peters, 572; 6 Wheat. 104; 8 Wheat. 326, 330; 9 Wheat. 598; 1 Peters, 582; 2 Peters, 96.

[Mr. *Wilde* gave an abstract of each of these cases, and dwelt particularly upon the last, where the court say, "The holder of a bill or promissory note in order to entitle himself to call upon the drawer or endorser, must give notice of its dishonour to the party whom he means to charge. But if, when the notice should be given, the party entitled to it should be absent from the state, and has left no known agent to receive it; if he absconds, or has no place of residence, which reasonable diligence, used by the holder, can enable him to discover, the law dispenses with the necessity of giving regular notice." He then examined the evidence to show how the case at bar was covered by the authority quoted, and that due diligence had been used.]

It is clearly shown moreover by the evidence, that when the bill fell due, both drawer and acceptor were insolvent.

Here then is the full justification of the second instruction and so much of the fifth as differs from the instruction prayed.

But if the facts clearly proved do not constitute due diligence, we say:

2. That Timberlake was not entitled to notice. · In regard to this transaction, we insist, he is to be considered either as a partner drawing on a partner, or the drawer of a bill for his own accommodation ; and in either branch of the alternative he is not entitled to notice.

1st. As a partner ; notice to one partner is notice to all. Gow on Partnership, 214, 215 ; 1 Campb. 82, 404 ; 1 Maule and Selw. 259 ; 20 Johns. Rep. 176.

[Mr. *Wilde* here examined the evidence to show that this was a partnership transaction, or if not so, that it was for the accommodation of the drawer.] Where the drawer has no effects in the hands of the acceptor, he is not entitled to notice. 1 Term Rep. 405 ; Chitty on Bills, ed. 1834, p. 39 ; 4 Maule and Selw. 226, 230, 231, 232 ; 3 Barn. and Ald. 619, 623 ; Chitty, 57 ; 3 Campb. 281 ; 4 Moore and Payne, 463.

The case of the Bank of Columbia *v.* French, 4 Cranch, 141, does not impugn the authority of Bickerdike *v.* Bollman, 1 Term Rep. 405 ; but merely overrules the case of Walwyn *v.* St. Quentin, and de Berst *v.* Atkinson, which are no longer law, even in England. See 15 East, 216 ; 3 Barn. and Ald. 619, 623. The case in 4 Cranch, 141, is commented on and sustained, as to the point, in 10 Peters, 578.

This branch of the argument may therefore be summed up as follows :

That Timberlake must be regarded either as a partner drawing on a partner, or as the drawer of a bill for his own accommodation. In the first instance, notice to Smith was notice to him ; in the second, he was clearly not entitled to notice.

There is no error, therefore, in the first or third instruction.

3. In seeking to determine the extent of Rhett's responsibility, he may be considered either as if his name were on the bill as endorser, or as if he were a mere guarantor. ·

1st. As if his name were on the bill.

In order to perfect the claim of the holder of a bill against the endorsers, it is not necessary for the holder to give notice to the drawer. It is for the endorsers to give notice to the drawer, if they wish to preserve a remedy against him. Chitty on Bills, ed. 1834, pp. 68, 69 ; 1 Strange, 441 ; Burr. 669 ; 2 Campb. 539.

Let it be remarked, that the note sued on was collateral security for Timberlake's bill ; if the bill were paid, the note was paid. Now, the note being duly protested for non-payment, and notice ·

thereof sent on the same day to Rhett and Haskell, Rhett and Has-
kell must have been thereby apprized that the bill was not paid, and
it was for them, according to the authorities just quoted, to give notice
to Timberlake if they desired to hold him responsible.

Let it be remarked further, that the very note given as collateral
security and sued on in this case, is endorsed by procuration. Smith
endorses both for Rhett and Haskell, under powers of attorney from
both. Smith, therefore, the attorney in fact of Rhett, had express
notice of the dishonour of the bill, for the collateral security of which
the note sued on was taken.

Notice to him was notice to Rhett, and if Rhett (considering him
in the light of an endorser) desired to hold Timberlake responsible,
it was for him to give Timberlake notice. The plaintiff was not
bound to do it.

This court, in delivering its opinion in Williams v. Bank of the
United States, 2 Peters, 96, already cited, evidently had the limita-
tion of the holder's obligations in view. They say, "it is incumbent
on him to give notice to the party whom he means to charge. He
is not obliged to notify any others; if they desire to have recourse
over on other parties, it is for them to give such parties notice."

Considering the rights and liabilities of Rhett, therefore, as if his
name were on the bill—the situation of the parties would be this:

Smith, acceptor, as partner, or for the accommodation of Timber-
lake.

Rhett, endorser, for the accommodation of Smith.

Now to whom had Rhett to look?

To Smith and Timberlake.

Both are liable:

Smith as acceptor.

Timberlake as the drawer of an accommodation bill, or as a
partner.

All Smith's effects are assigned to Rhett; and, whatever is due
from Timberlake to Smith, on their joint account, can be received
by Rhett from Timberlake. Timberlake continues liable to Smith
for whatever may be paid for him by Smith as acceptor for his
accommodation; or, considering them as partners, for the balance
of partnership accounts, and this balance, whatever it may be, is
assigned by Smith's assignment for Rhett's benefit as a protected
endorser.

Rhett, therefore, has sustained and can sustain no injury by the

want of notice to Timberlake. He has lost no security which he would have kept had such notice been given.

Timberlake was not entitled to notice. He is not discharged of his obligations to Smith or Rhett by want of notice.

If notice had been given to Timberlake, Rhett would have gained no advantage, and by its omission he has sustained no injury.

Considering Rhett as a guarantor.

"Persons whose names are not upon the instrument, or who are not parties thereto, but have transferred the instrument by delivery, when payable to bearer, are not within the custom of merchants. Therefore, a party who, by an independent memorandum guaranties the payment of a bill, is not as a matter of absolute right entitled to notice. It is not in general essential to give him notice: but as a surety (upon general principles) he may be discharged if he can show that a particular loss or prejudice has accrued to him from the omission to give him notice; but even then the discharge will only be, it seems, to the extent of the detriment."

The cases cited are: Warrington v. Furber, 8 East, 242; Swinyeard v. Bowes, 5 Maule and Selw. 62; Holbron v. Wilkins, 1 Barn. and Cress. 10; Van Wort v. Woolley, 3 Barn. and Cress. 439.

In the case of Warrington v. Furber, which was an action against the guarantor of a bill of exchange, on which no demand had been made against the acceptor; he having become bankrupt before the bill was due, it was held the guarantor was liable.

Lord Ellenborough, in delivering the opinion of the court, says: "The same strictness of proof is not necessary to charge the guarantors as would have been necessary to support an action on the bill itself, where by the law-merchant a demand upon and refusal by the acceptors must have been proved in order to charge any other party upon the bill; and this notwithstanding the bankruptcy of the acceptors. But this is not necessary to charge guarantors, who insure as it were the solvency of their principals; and, therefore, if the latter become bankrupt and notoriously insolvent, it is the same as if they were dead, and it is nugatory to go through the ceremony of making a demand on them."

Gross, J., says: "The necessity of a demand, notwithstanding the bankruptcy of the acceptor, in order to charge the drawer or endorser, is founded solely on the custom of merchants." 8 East, 246.

"The rule in the case of a guarantor," says Chancellor Kent in

his Commentaries, vol. 3, pp. 123, 124, "is not so strict as in that of mere negotiable paper. The neglect to give notice must have produced some prejudice to the guarantor: and in the case of absolute guarantee of the payment of a note, no demand or notice is requisite to fix the guarantor."

"And persons who are not parties to the instrument, but are responsible if it be not paid, as having guarantied the payment or delivered it without endorsement on account of a debt, are not, it seems by the custom of merchants, entitled to the strict observance of the rule as to presentment. As to such persons a formal presentment may be excused, by showing that the acceptor became insolvent before the bill fell due; that it would not have been paid if presented; that the defendants were aware of the fact, and that no injury resulted from the omission." Chitty on Bills, 48 a, ed. 1834. Refers to the cases already cited.

In the case of Reynolds et al. v. Douglass et al., 12 Peters, 503, this court say: "The rule is well settled that the guarantee of a promissory note, whose name does not appear on the note, is bound without notice where the maker of the note was insolvent at its maturity. That his liability continues unless he can show he has sustained some prejudice by want of notice of a demand on the maker of the note and non-payment."

In the present case the proof is full that both drawer and endorser were insolvent before the bill fell due; notice, therefore, would have been nugatory; and regarding Rhett as a guarantor, Poe was not bound to give him notice. Considering Rhett, therefore, either as if his name was on the bill, or as if he be a guarantor by a separate instrument, he is not released by the want of notice to Timberlake.

4. This brings me to consider our adversaries' view of their case. They insist that Timberlake is to be regarded as the drawer of a bill in the fair course of trade, having funds in Smith's hands at the time, and being entirely unconnected with him in any contract of partnership. I will not weary the court by going over the evidence, but I ask leave to remark, that this pretence is set up for the first time after the suit.

[Mr. *Wilde* here referred to particular parts of the evidence stated in the record.]

I desire the court to note in the next place that this attempt to give to this bill the colour of one drawn in the usual course of trade, upon funds in Smith's hands, rests solely on the testimony of Timberlake

and Smith. Now, assuredly it is not my purpose to impugn the
testimony of these gentlemen, who are entirely unknown to me; but
I should be false to my trust if I did not remark that their view of
this subject seems to have changed with their change of position.
The illusions of interest are at least as great as those of optics.

I ask the court to remark that Timberlake's effort to make out that
this was a bill drawn upon funds in Smith's hands, is exceedingly
lame. He says the bill was not drawn for my accommodation, it
being for the purpose of renewing my two bills, &c.; as if being in
renewal, it was necessarily not an accommodation.

[Mr. *Wilde* here again commented on the evidence.]

Let it be remarked, also, that Timberlake, in his evidence, does
not allude to the agreement between himself and Smith, to which
Smith testifies that if Timberlake paid the drafts for $13,500, he,
Smith, was to pay the draft for $8000. Remark, also, that Timber-
lake is never shown to have had any capital or funds.

With respect to Smith's evidence to make this business paper
drawn on funds in his hands. It is in contradiction with his previous
acts and declarations; with his letter to the bank; his declaration to
Adger; with all the earlier proceedings, in which both parties regard
and declare these bills accommodation paper; the only difference
being that Smith says they were drawn for the accommodation of
Timberlake, and Timberlake that they were drawn for the accommo-
dation of Smith. Taking Smith's evidence with all these drawbacks,
and what does it amount to? He states that these drafts were origi-
nally drawn on joint account for joint speculations in cotton and
stocks; that it was subsequently agreed between them that he the
witness would pay the draft for $8000, and that Timberlake would
pay the three drafts amounting to $13,500. That if Timberlake was
now to pay the three drafts amounting to $13,500, he, the witness,
would owe him the amount of the draft of $8000. Thus we see the
same paper assumes, according as the interest of the parties varies,
the character of partnership paper, accommodation paper, or business
paper drawn on actual funds.

But assuming for the sake of argument that Timberlake drew this
bill, having funds in Smith's hands.

The court will remark, by the testimony of Smith, " that he did
not assign any particular fund to meet the draft for $8000. That the
proceeds of the cotton sent to Bayard and Hunter were realized in
June or July, after he had executed his deed of assignment, and that

Rhett v. Poe.

he never applied those funds to the payment of Timberlake's drafts on him."

He further testifies, that the proceeds of the cotton sent to Bayard and Hunter in Savannah, were passed by him to the credit of R. B. Rhett, (the present defendant,) "and went to pay a note with Mr. Rhett's endorsement discounted at the Bank of Charleston."

Now, if Smith had funds of Timberlake's in his hands, he has sustained no injury by want of notice to Timberlake. And if these very funds have been passed over to Rhett, he has clearly no right to be discharged from his liability as guarantor for Smith, on the ground that injury has been sustained by want of notice to Timberlake.

The ground assumed for insisting on notice to Timberlake, is, that he has funds in Smith's hands. If he had no funds he is bound without notice. If he had funds, then Smith the acceptor as the original debtor, was bound to pay the bill, and Rhett is bound to Poe as the guarantor of Smith.

The court will observe that as to the drafts for $13,500, drawn by Timberlake and discounted by the bank, Rhett became in no manner liable. He became guarantor to the bank for Smith, by a collateral security only to the limited amount of the draft for $8000. Is it not to be taken then, that he gave this collateral security, relying on the cotton in the hands of Bayard and Hunter for his indemnity? And now, how does this matter stand upon the very footing claimed for it by the plaintiff in error? What is the justice, equity, and good conscience of the defence, according to our learned adversaries' own statement of it?

Smith obtains the proceeds of the cotton from Bayard and Hunter, and passes them over to Rhett by his general assignment. They go to pay a note of Smith's in bank, with Rhett's endorsement. Rhett having thus received the very fund upon which, as he alleges, the bill was drawn, insists on being released from his guarantee, because no notice was given to the drawer, Timberlake. But if Timberlake has funds in Smith's hands, the only ground for entitling him to notice, then Smith was the principal debtor, both in fact and form: and Rhett, having received the very fund, cannot evade his responsibility for Smith.

On the one hand, then, considering this as a bill drawn for Timberlake's accommodation. Could Timberlake recover against Smith on his acceptance? Evidently he could not. The case of Sparrow et al. v. Chisman, 4 Mann. and Ryl. 206, 207, is conclusive on that

point. If not, what injury has Timberlake sustained by want of notice? And if he has sustained no injury, he is not discharged. If he is not discharged, neither can Rhett be discharged, because the only claim of Rhett to be released is founded on the alleged release of Timberlake.

On the other hand, regarding this as a bill drawn by Timberlake on funds in Smith's hands, accepted by Smith, and the payment of that acceptance guarantied by Rhett, can Rhett after receiving under Smith's assignment the funds on which the bill was drawn, object that the drawer is discharged by want of notice?

Whatever room for cavil or dispute there may be on the other points of this case, there are two, in my humble judgment, decisive.

First. The unquestioned facts show due diligence.

Next. These drafts were clearly on joint account; and in a partnership transaction notice to one partner is notice to the other.

Where then is the error in granting the instructions given, or in refusing those refused?

The fourth and fifth instructions the court gave as prayed. They are out of the question.

The second the court gave with the necessary and lawful limitation, that if the jury believed the facts there stated, there was due diligence.

The first, it was no error to refuse, for the court merely laid down the rule with its legal limitation.

*Hunt*, on the same side, for the defendants in error, said,

The acceptance and note bore date the same day, and became due the same day; and the whole case turns upon the steps taken to demand payment, and give notice of non-payment of this draft.

Mr. Rhett contends that the note on which he was endorser was only a collateral security; and if the holder, by any laches, has made the draft his own by discharging any of the parties, he is paid, and the collateral note is discharged; and he charges that D. Timberlake was discharged, as drawer of the bill, by neglect to give him notice of its non-payment. That, as sureties, the parties to the note are entitled to their remedy over against Timberlake, the drawer; and it was the duty of the holder to give him due notice, in order to fix his liability; and having neglected to do so, the note is not obligatory.

To this defence, the defendant in error answers:

1. That the note and draft were contemporaneous securities for

Rhett v. Poe.

the payment of one sum of $8000 on the 11th July, and that the failure of the acceptor of the bill to pay it at maturity, instantly rendered all the parties to the note liable; and having received due notice of the non-payment of the draft, by being notified as endorsers of the note, they are bound as of 11th July, 1837; and if they desired to make use of the bill, they were bound to pursue their remedy by paying the note and receiving the draft. No obligation attached to the holder to do more than demand payment, and on its refusal, to resort to his other security for the debt.

The note was not an ultimate security dependent upon exhausting the remedies upon the bill, but a concurrent one, and was perfected by the mere dishonour of the draft by the acceptor.

2. That as far as relates to the plaintiff in error, even if he had a right to require the holder to give notice to Timberlake, and had a right to the draft, he has sustained no damage, as the said Timberlake was wholly insolvent at the time it became due; and even as surety he can only claim to the extent of the loss proved.

3. That, in fact, the holder did use due diligence to fix the drawer, by using the ordinary means to give him notice.

That the drawer left the state where he transacted business, and had his domicil when the draft was negotiated, and without giving any notice to the holder where notice would reach him; and so, being out of the realm, he was not entitled to notice.

4. That said Timberlake and Benjamin R. Smith were copartners in relation to the said draft, and were equally bound to have provided funds for its payment; and a notice and demand upon one copartner was a notice to both, and so said Timberlake is responsible, being a copartner, as acceptor of the bill as well as drawer.

5. The said Timberlake was not entitled to notice, and was liable on said draft without notice, because he had intercepted and used the copartnership funds, which ought to have been applied to the payment of that draft.

6. The defendant in error also contends, that Mr. Rhett cannot complain of any want of notice, inasmuch as he has received, as a preferred creditor of the acceptor, the identical copartnership funds which ought to have been applied to the payment of this draft. He got $8000 in first class, and full indemnity in the next, and no account of the proceeds of the cotton.

7. That Timberlake knew that the acceptor had assigned all the funds of the copartnership prior to the maturity of the draft, and so

knew it could not be paid; and Mr. Rhett was the assignee, and has received the fund.

And so the defendants in error will contend, that R. Barnwell Rhett was bound, as endorser, to pay the said note of $8000, and that the instructions by the court contain the true legal positions arising out of the cause; and they deny that the plaintiff in error was authorized to require the court to state the law on any supposed case, or any imperfect statement of this case. It is enough if the court state the rules of law correctly, and leave the jury to apply them.

That if the court think that there was no other connection between the note sued upon and the draft of $8000 than this; that the holder was to demand payment of the draft at maturity, and in default of payment, was authorized to resort to the note immediately—and did so—and gave due notice to the parties on the note—and was not bound to do more—then the instructions were all immaterial, and the necessity of any notice, and the fact of due diligence as to the bill, did not arise in the case.

1st Point. The note, even if collateral, was a security that the bill was good and would be paid at maturity, and the moment it was dishonoured the note became absolute and the right of action accrued, and there is no dispute that the parties to the note were duly notified.

The holder of the bill was not obliged to notify the drawer; the notice to the endorser of the note was sufficient, and they were bound to look to the parties to the bill and fix them.

The note was a security that the bill would be paid at maturity. See Trimble v. Thorne, 16 Johns. Rep. 152. The parties to the note were bound to pay it at maturity in the order of notice.

If so, then has Poe lost his claim; the neglect to notify is by way of discount. It is a demand independent of the note. Rhett was no party to the bill.

Suppose Rhett had paid the note, could he then recover against Poe for neglect? What sort of contract? Was he agent? The delivery of the note with no condition was absolute; the memorandum in pencil does not alter the contract.

The party who receives a guarantee is not bound to give notice; the guarantor must look out for his own safety. 2 Hen. Bla. 616.

The guarantor is bound without notice where the drawer is insolvent, unless he proves that some special damage accrued from the

failure to give notice.     A distinction is recognised between parties to
a bill and guarantors.     2 Peters, 497.

The same strictness of proof is not necessary to charge the gua-
rantor as in an action on the bill itself.     8 East, 245.

In 6 Vesey, 734, Lord Ellenborough says, there is no obligation
of active diligence on the part of the creditor, as far as the surety is
concerned.     The law-merchant is confined to papers where all are
parties to the bill.     2 Johns. Chan. Ca. 559, 560, 662.

2d Point. Rhett has sustained no damage, as Timberlake was in-
solvent.

[Mr. *Hunt* here referred to several parts of the evidence to show
that he was insolvent.]

The guarantor is only entitled to complain of want of notice where
he has sustained injury, and there only to the extent of the injury.
He guarantees the solvency of the parties to the bill, and if they are
insolvent, he is liable.     12 Peters, 503.

Insolvency is an excuse for no demand being made, where the
claim is prosecuted against a guarantor not on the bill.     9 Serg. and
Rawle, 202 ; 8 East, 242, confirmed by 2 Taunt. 212.

3d Point. The holder did use due diligence.

[Mr. *Hunt* here examined the evidence.]

A letter put into the post-office is sufficient.     6 Taunt. 305 ;
2 Hen. Bla. 509; 17 East, 385.

If a party has absconded, no notice is necessary, 4 Mass. 45—53.

It is not necessary to prove that a letter was actually mailed ; only
that it was put in the proper way of being so.     4 Campb. 194;
4 Bing. 715, (15 E. C. L. R. 125;) 1 Term Rep. 167; 3 Adol.
and El. 193, (30 E. C. L. R. 69;) 1 Term Rep. 294; 5 Johns. 375;
2 Espinasse Rep. 516.

The law considers the place where the bill is drawn as the resi-
dence of the drawer.     2 Caines, 127.

In the court below, the judge only decided what constitutes due
diligence in law.     The facts were left to the jury.

4th Point. That Timberlake and Smith were partners, &c.

[Mr. *Hunt* referred to the evidence to show that they were part-
ners.]

To constitute a partnership, both names need not be used ; it is
enough if the money went to a joint account.     8 Barn. and Cress.
427, (15 E. C. L. R. 257;) 3 Campb. 493 ; 2 Barn. and Adol. 23,
(22 E. C. L. R. 18, 19 ;) 2 Peters, 197; 20 Johns. 126 ; 17 Ves.

412; 7 East, 210; 1 Campb. 82; 18 E. C. L. R. 436; 4 Maule and Selw. 226.

The case in 2 Campb. 309, cited on the other side, only decides that the note of one partner could not be declared upon as a joint note; but here the drawer and acceptor were copartners, and it was one paper, by both partners, for a joint debt. See 3 Campb. 496.

5th Point. Timberlake was not entitled to notice, because he had intercepted the funds, &c. 1 Wash. C. C. R. 461; 4 Mason, C. C. R. 113; 2 Nott and McCord, 257, 438.

[The argument upon the remaining points was entirely a comment upon the evidence.]

Mr. *Legare*, (attorney-general,) for the plaintiff in error, and in conclusion.

The doctrine contended for upon the other side, puts all the cotton buyers out of the protection of the law-merchant, if Timberlake was not entitled to notice. The mistake of the other side is in supposing that Rhett considered himself entitled to notice. But he did not.

In 12 Peters, the court said that a guarantor was only entitled to a notice in a different manner from the acceptor. This is admitted. In 8 Pick. 426, Chief Justice Parker says, that the contract of guarantee is not clearly settled in the books.

The first and second instructions prayed for in the court below, by the counsel of Mr. Rhett, involve the following propositions:

1. That the note was collateral security.

2. That the parties to it were guarantors.

3. That as such, they would be entitled to the bill and all the rights of the bank.

4. Whatever extinguishes the right of the principal destroys the guarantee.

5. That by the omission to find Timberlake he was as much released as if he had a written receipt.

6. That therefore the guarantor, Rhett, was discharged.

1st and 2d points. It was marked on the note itself that it was collateral security for the bill, by the agent of the party himself. If the principal is more bound than the rest, then it is a case of guarantee.

The case in 14 Ves. 159, is a case of distinct collateral security and not co-suretiship. The situation of the parties in that case was very analogous to this, and yet they were not all held principals.

Notice must be given to the guarantor unless both parties are bankrupt. This was a guarantee of the bill and not that the acceptor only should pay it. 2 Taunt. 206. The case in 8 East, 245, is examined in the above.

3d and 4th Points. The guarantor has a right to be subrogated to the rights of the creditor; and if the principal is released through negligence, the guarantor is also. 1 Pothier on Obligations, 365; 1 Bell's Commentaries, 347, 377, 5th ed.

Bankruptcy in the books means something positive, and not loose talk of insolvency. 4 Johns. Chan. Rep. 123, 140; 11 Ves. 22; 9 Wheat. 680.

5th Point. Was Timberlake discharged? This is the only difficult point in the case.

The burden of proof that due diligence was used, is on the other side. Doug. 179; 7 East, 231; 3 Barn. and Rob. 619; Chitty on Bills, 511, 512.

The least doubt of notice is fatal to the claim. Chitty, as above.

[Mr. *Legare* here examined the evidence as to the degree of diligence that was used.]

But it is said that Timberlake was not entitled to notice because he had no funds in the hands of the drawee. The counsel on the other side attempted to prove that Rhett had got possession of this fund under the assignment, after proving that there was no fund there. But there was a fund. Smith drew for $5000 in February, 1837, and in April for $5000 more, making $10,000; it remained in his hands. If he dishonoured the previous bills, his funds were not paid away. Lord Kenyon, in the case cited from Term Reports, allowed a plaintiff to show that there were no funds, and by this decision produced great difficulty. Half of Chitty's book is filled with cases resulting from this doctrine.

The drawer is entitled to notice, although the bill is for the acceptor. Chitty, 481.

Where there is drawing and re-drawing, there must be notice. 2 Vesey and Beames, 240; Chitty, 480, note—where the rule of Lord Kenyon is regretted.

It is said that Timberlake had absconded. But this court have said that absconding means quitting his house in a secret manner. The case quoted from 2 Peters decides this. But the northern merchants come to the south to buy cotton and go away when the season is over. These men cannot be outlawed. The evidence shows

that Timberlake resided in New York. [Mr. *Legare* referred to the evidence.] The case in 2 Peters, 96, only says that where parties live in the same town, notice must be left at the residence; but if he absconds, due diligence only need be used.

As to absconding, see 9 Wheat. 598; 3 Taunt. 130; Chitty on Bills, 401 ; 1 Lord Raymond, 743, a leading case, where a house was shut up, which is an act of bankruptcy in England. 9 Serg. and Rawle, 201; Chitty, 486. Chitty says (486) if there is no residence, due diligence must be used. Has it been used in this case?

[Mr. *Legare* remarked upon the evidence]

It is said that there was a partnership.

If Timberlake and Smith were partners, all who draw and re-draw are so. They agreed to purchase stocks, but did not buy them; and took back the money. Afterwards Timberlake bought stocks on his own account, and permitted Smith to come in.

Mr. Justice DANIEL delivered the opinion of the court.

The instrument upon which this suit was instituted in the Circuit Court, was, as the aforegoing statement evinces, in form simply a common promissory note, signed by Benjamin R. Smith, made payable to William E. Haskell, endorsed by Haskell to Robert Barnwell Smith *alias* Robert Barnwell Rhett, and ·by this last individual to Robert F. Poe, cashier of the Bank of Augusta, the plaintiff in the action. Such being the nature of the instrument, and it appearing that the formalities of demand at its maturity, and notice to the endorsers have been regularly fulfilled by the holder, a question as to the justice of a recovery by the latter could scarcely be suggested, if the rights and obligations of the several parties shall be viewed as dependent upon their relation to the note itself considered as a distinct and separate transaction. Such, however, is not precisely the attitude of the parties to this controversy. It is in proof that there was held by the plaintiff below, beside this note, a draft for $8000 drawn by Timberlake on the 6th of May, 1837, at sixty days, in favour of the plaintiff, on Benjamin R. Smith, and accepted by Smith; and farther, that upon the note was written by the plaintiff's agent, a memorandum in the following words: "This note is collateral security for the payment of the annexed draft of D. Timberlake on B. R. Smith of $8000." Upon the effect of both these instruments, as constituting parts of one transaction, the questions propounded to the Circuit Court and brought hither for review have

arisen.   The farther proofs contained in this record will be adverted
to in the progress of this opinion, as notice of them shall become neces-
sary to explain the instructions prayed for, and those given by the
Circuit Court on the trial of this cause.   The second series of instruc-
tions, embracing a more extended and varied survey of the evidence
than is contained in that preceding it, will be first considered.   It is
to the first, second, third, and fifth instructions of this second series
that exceptions are taken.   To the first proposition affirmed by the
court in this first instruction, it is difficult to imagine any just ground
of objection on the part of the defendant below, as that proposition
concedes almost in terms the prayer of that defendant.   To the second
branch of this instruction it is not perceived that any valid objection
can be sustained; for, although it might have been true that at the
date of acceptance of Timberlake's draft on Smith for $8000, the
latter had been in possession of $10,000 placed in his hands by Tim-
berlake, it would not follow under the circumstances proved, or under
those assumed in the instruction, that Timberlake as the drawer of
that draft was entitled to notice.   If, as the instruction supposes, the
acceptances for $21,500, which Smith had come under for Timber-
lake, were drawn for the accommodation of the latter, upon the faith
of funds to be furnished by him for their payment; that the $10,000
had been furnished by Timberlake in part for that purpose, but had
been withdrawn by him for his own uses prior to the maturity of the
draft for $8000—that he should have intercepted before the maturity
of the draft all the funds against which he knew the acceptances of
Smith were drawn, and that he the drawer, and Smith the acceptor,
had, before such maturity, become notoriously insolvent, under such
a predicament the law would not impose the requirement of notice to
the drawer upon the holder.   No useful or reasonable end could be
answered by such a requisition.   Where a drawer has no right to
expect the payment of a bill by the acceptor, he has no claim to
notice of non-payment.   This is ruled in the following cases: Sharp
*v.* Baily, 9 Barn. and Cress. 44; 4 Mann. and Ryl. 18; Bicker-
dike *v.* Bollman, 1 T. Rep. 405; Brown *v.* Meffey, 15 East, 221;
Goodall *v.* Dolly, 1 T. Rep. 712; Legge *v.* Thorpe, 12 East, 171.
If the $1000 said to have been in the hands of Smith were by the
agreement or understanding between Smith and Timberlake to be
applied in payment of joint claims against them, and falling due
before the draft for $8000, and had been so applied, it had answered
the sole object for which it had been raised, and could not in the

apprehension of these parties constitute a fund against which the draft of $8000 subsequently to become due was drawn. Those $10,000 were gone, were appropriated by these parties themselves. Then if, after this appropriation, there was, as this instruction assumes, an arrangement between Timberlake and Smith in respect to the bills drawn by Timberlake to the amount of $21,500, that he was to put Smith in funds sufficient to pay $13,500 of the amount just mentioned, which were to become payable before the $8000 draft, and that on Timberlake's supplying those funds Smith was to pay the $8000 draft, and Timberlake failed to put Smith in funds to take up the $13,500, and that the drafts for the same were protested, of which Timberlake had notice, he, Timberlake, could have no claim to notice of non-payment of the draft for $8000. There could be no reason for such a notice from the holder of the draft. Timberlake could have had no right to calculate on the payment of this draft; on the contrary, he was bound to infer its dishonour. He knew that payment of the draft for $8000 was dependent upon a condition to be performed by himself, and he was obliged to know from the notice of the dishonour of all his bills, that he had not performed that condition, and had thereby intercepted the very funds from which the acceptances by Smith were to be met. He therefore *quoad* this draft had never any funds in the hands of Smith, and consequently, never had any claim to notice of non-payment from the holder.

The case of Claridge v. Dalton, in 4 Maule and Selw., is strongly illustrative of the principle here laid down. That was a case in which the drawer had supplied the drawee with goods which were still not paid for. To this extent, then, the former unquestionably had funds in the hands of the latter; but on the day of payment of the bill the credit upon which the goods were sold had not expired, and the court thereupon unanimously ruled that *quoad* the obligations of the parties arising upon these transactions, the drawer must be understood as having no effects in the hands of the drawee, and therefore, not entitled to notice. The second instruction affirms in the first place, what must be admitted by all, and what is not understood to be matter of contest here, viz.: that whenever a party to a bill or note is entitled to notice, such notice, if not given him in person, must be by a timely effort to convey it through the regular or usual and recognised channels of communication with the party or his agent, or with his known residence or place of business. It is to so much of this instruction as is applicable to what may amount to

a dispensation from the regular or ordinary modes of affecting parties with notice, that objection is made; to that portion in which the court charged the jury, that if they believed from the evidence that although Timberlake may have resided in New York, that he had since the autumn of 1834 or 1835 made Augusta his residence, and that he had removed from Augusta, and out of the state of Georgia after the bill for $8000 was drawn and before its maturity, that then due diligence had been used to give him notice of the dishonour of the bill. It is not considered by this court that this charge in any correct acceptation of it trenches upon the legitimate province of the jury, or transcends the just limits of the authority of the court, or contravenes any established doctrine of the law. 'Tis a doctrine generally received, one which is recognised by this court in the case of the Bank of Columbia v. Lawrence, 1 Peters, 578, that whenever the facts upon which the question of due diligence arises are ascertained and undisputed, due diligence becomes a question of law; see also the Bank of Utica v. Bender, 21 Wendell, 643. In the case before us every fact and circumstance in the evidence which was to determine the residence of the drawer in Augusta, or his abandonment of that residence, or his removal from the state of Georgia;. the unsettled and vagrant character of his after-life, the fruitless inquiries by the notary to find out his residence, the notoriety of his having neither domicil nor place of business in Georgia, the effort to follow him with notice of dishonour of his draft, were all submitted to the jury to be weighed by them. The charge of the court should be interpreted with reference to the testimony which is shown to have preceded it, upon which, in truth, it was prayed; with reference, also, to the reasonable conclusions which that testimony tended obviously to establish. Interpreted by this rule, it amounts to this, and this only, a declaration to the jury that if the evidence satisfied them of the residence of Timberlake in Augusta at the time of drawing the draft, of the certainty and notoriety of his having abandoned that residence and the entire state before its maturity, leaving behind him no knowledge of any place, either of his residence or for the transaction of his business, satisfied them also of the real but unavailing effort of the notary who protested the draft to discover his whereabout, they ought to infer that due diligence had been practised by the holder of the draft. In the case of an endorser, with respect to whom greatest strictness is always exacted, it has been ruled that the holder of a bill is excused for not giving regular notice of dishonour

to the endorser, of whose place of residence he is ignorant, if he use reasonable diligence to discover where the endorser may be found. Thus, Lord Ellenborough in Bateman *v.* Joseph, 2 Campb. 462, remarks, "When the holder of a bill of exchange does not know where the endorser is to be found, it would be very hard if he lost his remedy by not communicating immediate notice of the dishonour of the bill; and I think the law lays down no such rigid rule. The holder must not allow himself to remain in a state of passive ignorance, but if he uses reasonable diligence to discover the residence of the endorser, I conceive that notice given as soon as this is discovered is due notice within the custom of merchants." See to the same effect 12 East, 433; Baldwin *v.* Richardson et al., 1 Barn. and Cress. 245; Beveridge *v.* Burgis, 3 Campb. 262. It has been held in Massachusetts, that where the maker of a promissory note had absconded before the day of payment, presentment and demand could not be required of the holder in order to charge the endorser: opinion of Parsons, Chief Justice, in Putnam *v.* Sullivan, 4 Mass. Rep. 53. In Duncan *v.* McCullough, 4 Serg. and Rawle, 480, it was ruled that if the maker of a promissory note is not to be found when the note becomes due, demand on him for payment is not necessary to charge the endorser, if due diligence is shown in endeavouring to make a demand. Hartford Bank *v.* Stedman, 3 Conn. Rep. 487, where the holder of a bill who was ignorant of the endorser's residence, sent the notice to A. who was acquainted with it, requesting him to add to the direction the endorser's residence, it was held that reasonable diligence had been used. The measures adopted in this case by the holder of Timberlake's draft, when viewed in connection with the condition and conduct of the drawer himself, appear to come fully up to the requirement of the authorities above cited; and, therefore, in the judgment of this court, affect him with all the consequences of notice, supposing this now to be a substantial proceeding upon the draft itself.

Next and last in the order of exception, is the fifth instruction. The first position in this is given almost literally in the terms of the prayer. The court proceeds further to charge, that if the insolvency of the drawer and acceptor were known to each other, and that this bill was drawn to pay for purchases on joint account, or a transaction in which they were partners, and the property so purchased had been diverted by the drawer to his own use, and that the payment of the bills had been the subject of private arrangement between the acceptor and drawer, that then the holder was excused from giving notice of the

non-payment of the bill for $8000. With respect to the exception taken to this instruction, all that seems requisite to dispose of it, is the remark, that if the drawer of the bill was in truth the partner of the acceptor, either generally, or in the single adventure in which the bill made a part, in that event notice of dishonour of the bill by the holder to the drawer need not have been given. The knowledge of the one partner was the knowledge of the other, and notice to the one notice to the other. Authorities upon this point need not be accumulated; we cite upon it Porthouse *v.* Parker, 1 Campb. 82, where Lord Ellenborough remarks, speaking of the dishonour of the bill in that case, "as this must necessarily have been known to one of them, the knowledge of one was the knowledge of all;" also, Bignold *v.* Waterhouse, 1 Maule and Selw. 259; Whitney *v.* Sterling, 14 Johns. Rep. 215; Gowan *v.* Jackson, 20 Johns. 176. Recurring now to the first series of instructions prayed for, we will consider how far the two propositions presented by them were warranted by the correct principles upon which the opinion of the courts may be invoked; and how far the court was justifiable in rejecting the propositions in question, upon the ground either of want of connection with any particular state or progress of the evidence—or of support and justification as derived from the entire testimony in the cause. It is a settled rule of judicial procedure that the courts will never lay down as instructions to a jury, general or abstract positions, such as are not immediately connected with and applicable to the facts of a cause, but require that every prayer for an instruction should be preceded by and based upon a statement of facts upon which the questions of law naturally and properly arise. It is equally certain that the courts will not, upon a view of the testimony which is partial or imperfect, give an instruction which the entire evidence in a cause when developed would forbid. Tested by these rules, the two instructions prayed for in the first series are deemed to be improper, they are accompanied with no statement of the testimony as their proper and immediate foundation; they are bottomed exclusively upon assumption, and such assumption too as the testimony taken altogether is believed to contradict. The court, therefore, properly refused these instructions; for this refusal it was by no means necessary that the causes should be assigned, by the court, *in extenso*—these are to be seen in the character of the instructions themselves, and in the testimony upon the record. This court has thus considered and disposed of the several prayers for instruction in this cause, and of the rulings of the Circuit Court thereupon.

Whilst this procedure has been proper with the view of ascertaining how far the rights of the parties have been affected by the several questions presented and adjudged in the Circuit Court; it is our opinion that the true merits of this controversy are to be found within a much more limited and obvious range of inquiry than that which has been opened by these questions. The note on which the action below was instituted, was given as a guarantee for the solvency of the parties to the bill for $8000, drawn in favour of the plaintiff, and for its punctual payment at maturity. Such being the character and purposes of the note, was it necessary, in order to authorize a recovery upon it, that every formality, all that strictness should have been observed in reference to the bill intended to be guarantied, which it is conceded are indispensable to maintain an action upon a mercantile paper against a party upon that paper? It is contended that a guarantee is an insurance of the punctual payment of the paper guarantied; is a condition and a material consideration on which this paper is received, and therefore that a failure in punctual payment at maturity is a forfeiture of such insurance on condition, rendering the obligation of the guarantor absolute from the period of the failure. Whether this proposition can or cannot be maintained to the extent here stated, the authorities concur in making a distinction between actions upon a bill or note, and actions against a party who has guarantied such bill or note by a separate contract. In the former instances notice in order to charge the drawer or endorser is with very few established exceptions uniformly required; in the latter the obligation to give notice is much more relaxed, and its omission does not imply injury as a matter of course. In Warrington v. Furbor, 8 East, 242, where the guarantee was not by endorsement of the paper sued upon, and the action was upon the contract, Lord Ellenborough said, "that the same strictness of proof is not necessary to charge the guarantees as would have been necessary to support an action on the bill itself, where by the law-merchant a demand and a refusal by the acceptor ought to be proved to charge any other party on the bill, and this notwithstanding his bankruptcy. But this is not necessary to charge guarantees who insure as it were the solvency of the principal, and if he becomes bankrupt and notoriously insolvent, it is the same thing as if he were dead, and it is nugatory to go through the ceremony of making a demand upon him." Le Blanc, Justice, says, in the same case, "there is no need of the same proof to charge a guarantee as there is a party whose name is on a bill of exchange; for

it is sufficient as against the former to show that the holder could not have obtained the money by making demand of it." The same doctrine may be found in Philips v. Astling et al., 2 Taunt. 205. So too, Lord Eldon in the case of Wright v. Simpson, 6 Ves. 732, expresses himself in terms which show his clear understanding of the position of a collateral guarantee or surety, his language is " as to the case of principal and surety; in general cases, I never understood that as between the obligee and the surety there was an obligation to active diligence against the principal, but the surety is a guarantee, and it is his business to see whether the principal pays and not that of the creditor." The case of Gibbs v. Cannon, 9 Serg. and Rawle, 198, was an action against a guarantor who was not a party on the note, upon his separate contract. The Supreme Court of Pennsylvania decided in this case, that provided the drawer and endorser of the note were solvent at the maturity of the note, notice of non-payment should be given to the guarantor, and that the latter under such circumstances may avail himself of the want of notice of non-payment, but it places the burden of proving solvency, and of injury flowing from want of notice upon the guarantor. The last case mentioned on this point, and one which seems to be conclusive upon it, is that of Reynolds v. Douglass et al., 12 Peters, 497, in which the court establish these propositions.

1st. That the guarantor of a promissory note, whose name does not appear upon the note, is bound without notice, where the maker of the note was insolvent at its maturity, unless he can show that he has sustained some prejudice by want of notice of a demand on the maker, and of notice of non-payment.

2d. If the guarantor can prove he has suffered damage by the neglect to make the demand on the maker, and to give notice, he can be discharged only to the extent of the damage sustained. Tried by the principles ruled in the authorities above cited, and especially by that from this court, in 12 Peters, it would seem that this case should admit of neither doubt nor hesitancy. The note on which the action was brought was given as a guarantee for the payment of the bill for $8000, as is proved and indeed admitted on all hands. It is the distinct and substantive agreement by which the guarantee of the bill was undertaken. It is established by various and uncontradicted facts and circumstances in the cause, and finally by the solemn admissions of Timberlake the drawer and Smith the acceptor of the bill, both of whom have testified in the cause, that at the maturity of the

bill they were both utterly insolvent; that Timberlake was probably so before the commencement of these transactions, and that Smith before the maturity of the bill had made an assignment of every thing he had claim to, for the benefit of others, and, amongst the creditors named in that assignment, providing for the plaintiff in error as ranking high amongst the preferred class.

Under such circumstances to have required notice of the dishonour of the bill would have been a vain and unreasonable act, such as the law cannot be presumed to exact of any person. Upon a review of the whole case, we think that the judgment of the Circuit Court should be affirmed.

#### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the district of South Carolina, and was argued by counsel. On consideration whereof, It is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby affirmed with costs and damages at the rate of six per centum per annum.