## IROQUOIS IRON CO. v. KRUSE.

### PINE TREE MFG. CO. et al. v. SAME.

(Circuit Court of Appeals, Eighth Circuit. March 13, 1917.)

(Nos. 4737, 4738.)

**1. JUDGMENT ⟨683⟩—CONCLUSIVENESS—PERSONS NOT PARTIES—ASSIGNEES.**

K. and T., both agents of a company which acted for the I. company in procuring mineral lands, purchased the surface of a tract of land and by reason of the surface ownership obtained a favorable lease from the P. company, the owner of the minerals, which was turned over to the I. company. T. had a secret contract with the P. company, whereby a part of the royalties under the lease were to be paid to him, and the I. company, on learning thereof, forced him to assign his contract to it. K. sued T. and the P. company to establish an interest in the contract between T. and the P. company, and obtained judgment. *Held*, that while the I. company was then vested with full title to all of T.'s interest in this contract, it was not bound by such judgment, not having been a party to the action.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1206.]

**2. TRUSTS ⟨102(1)⟩—CONSTRUCTIVE TRUSTS—VIOLATION OF CONFIDENCE.**

When one person is placed in such relation to another that he becomes interested for or with him in any property or business, he is in such fiduciary relation with him as to be prohibited from acquiring rights in such property or business antagonistic to the person with whose interests he is associated and if, in violation of this inhibition, he acquires any property or interest by means of interest or information acquired through the fiduciary relation, thereby preventing or hindering his associate in accomplishing the object of the agency, the property thus acquired is charged with a constructive trust for the benefit of his associate.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 153.]

**3. TRUSTS ⟨102(1)⟩—CONSTRUCTIVE TRUSTS—VIOLATION OF CONFIDENCE.**

Neither a legal nor equitable interest by either party during the relation in the property subsequently acquired, nor authority in either to buy or sell it, nor damage to the party betrayed, nor the existence of the fiduciary relation at the time the confidence is abused, is indispensable to the existence of the relation, and a subsequent abuse of the confidence bestowed under it for the purpose of acquiring the property is sufficient.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 153.]

**4. TRUSTS ⟨102(1)⟩—CONSTRUCTIVE TRUSTS—VIOLATION OF CONFIDENCE.**

The principle applies, not only to the agent himself but to his subagents, clerks, assistants, and partners in business.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 153.]

**5. TRUSTS ⟨102(1)⟩—CONSTRUCTIVE TRUSTS—VIOLATION OF CONFIDENCE.**

The R. company, engaged in mining, and whose stock was owned by various iron manufacturers, one of which was the I. company, also, for a compensation, devoted its energy to discovering and acquiring other ore lands and developing mines for such manufacturers. T., its general manager, and H., its general field superintendent, purchased the surface of a tract of land, and by reason of the surface ownership obtained a favorable lease from the P. company, the owner of the minerals in such land, which lease was turned over to the I. company, as was intended from the outset. T. had a secret contract with the P. company, whereby

---

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

241 F.—28

a part of the royalties under the lease were to be paid to him. The I. company ·forced T.· to assign this contract to it, and sued K. and the P. company to enforce a constructive trust in the benefits arising out of such contract. *Held,* that the rule that neither agents nor subagents may acquire rights against the principal in the subject-matter of the employment by virtue of knowledge or information obtained as an incident thereto applied to K., even though he was not fully informed as to the exact relationship between the R. and I. companies; he knowing practically what was done and sought to be done.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 153.]

6. TRUSTS ⬅110—SUITS TO ESTABLISH AND ENFORCE—EVIDENCE.
Though the I. company was seeking only to obtain ore bodies and was not acquiring the surface as such, evidence *held* to show that K. knew the tract was being acquired primarily, not as a surface proposition, but as an important adjunct to the acquisition and uses of mines and mining.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 160.]

7. TRUSTS ⬅107—CONSTRUCTIVE TRUSTS—VIOLATION OF CONFIDENCE.
Where it was conceded that T. abused the confidence of both the R. and I. companies and that his interest was held in trust for the I. company, K. was charged with his knowledge of the purposes of the transaction, even though he did not know that the transaction was a fraud on the I. company, as he and T. were partners, and a partnership cannot profit by the act of a member in betrayal of the confidence reposed in him as fiduciary.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 157.]

8. TRUSTS ⬅312—CONSTRUCTIVE TRUSTS—REIMBURSEMENT OF EXPENSES.
While T. and K. were entitled to be reimbursed for their actual expenses and outlays for the benefit of the principal, where the I. company in settling with T. had allowed expenditures made by him, K. was bound to look to T., his partner, for the satisfaction of any rights he had in respect to money turned over to T. for use in the transaction.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 431.]

9. MINES AND MINERALS ⬅64—CONTRACTS—ASSIGNMENTS.
Neither the P. company nor its successor in interest could refuse to perform the agreement with T. merely because the I. company had taken over such contract from T.; its situation not being changed to its disadvantage.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 181–184.]

Appeal from the District Court of the United States for the District of Minnesota.

Suit by the Iroquois Iron Company against Henry J. Kruse and others, in which the Pine Tree Manufacturing Company and another filed a cross-bill. From a decree in favor of Kruse, plaintiff and the cross-complainants bring separate appeals. Reversed and remanded, with directions.

George T. Buckingham, of Chicago, Ill. (Edward L. Shannon, of Denver, Colo., on the brief), for appellant in No. 4737.

H. B. Fryberger and Oscar Mitchell, both of Duluth, Minn. (Frank B. Kellogg, of St. Paul, Minn., on the brief), for appellee in No. 4737.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

N. H. Clapp and A. W. Clapp, both of St. Paul, Minn., for appellants in No. 4738.

H. C. Fulton, of Duluth, Minn. (H. B. Fryberger and Oscar Mitchell, both of Duluth, Minn., and Frank B. Kellogg, of St. Paul, Minn., on the brief), for appellee in No. 4738.

Before CARLAND, Circuit Judge, and TRIEBER and VAN VALKENBURGH, District Judges.

VAN VALKENBURGH, District Judge. During the years 1909 and 1910, appellant Iroquois Iron Company, an Illinois corporation, had its business office in the Corn Exchange National Bank Building at Chicago. The Rogers-Brown Ore Company, a Minnesota corporation, occupied a part of the same suite of offices. The principal business of the Iroquois Company was the manufacture of pig iron, and the chief raw material used in this manufacture was iron ore. The Rogers-Brown Company was organized to prospect for and acquire lands containing iron ore, to develop mines upon these lands, and to produce iron ore. The capital stock of the Ore Company was owned by various iron manufacturers, such as Iroquois, who depended upon it largely for their raw material. The Iroquois Company alone owned 29 per cent. of the Ore Company's stock. The directors in the two companies were largely the same; the president and general manager of the Rogers-Brown Company spent most of their time in the Chicago offices, which constituted its administrative headquarters; its operating office was at Deerwood, Minn., on the Cuyuna Range, a district exceedingly rich in iron ore. One Chester D. Tripp, son of an Iroquois director, was general manager of the Rogers-Brown Ore Company. Henry J. Kruse, appellee, was its general superintendent in charge of its field operations, with engineers, draftsmen, and stenographers under him. He was stationed at Deerwood, and, except when Tripp, his immediate superior, paid occasional visits from Chicago, had exclusive direction of the Ore Company's affairs on the Range.

The Rogers-Brown Ore Company, acting as the feeding instrument of the different companies which owned its stock, in addition to the activities first above described, on occasion devoted its energies, its organization and tools to the discovery and acquisition of other ore lands and the development of mines thereon for its clients, more particularly the iron manufacturers by whom it was organized and controlled. Generally, it appears, it acted contemporaneously on behalf of these several companies; but at the particular time under consideration, beginning some time in the year 1909 and extending through 1910, the Iroquois Company alone had signified its purpose to acquire other mining properties in this district, desiring a larger ore supply than it could get from the holdings of the Rogers-Brown Company. The field organization of the latter company, including its general superintendent, Kruse, and under the direction of its general manager, Tripp, was, during this period, engaged largely in these operations, which consisted in seeking out promising locations, securing preliminary contracts and options, followed up by such exploration work as was necessary to establish the desirability of ultimate working leas-

es. At the outset, the parties directly interested may have been known only to the managing officers of the Ore Company, but that company was well understood by its employés, and particularly by the appellee, to be engaged in acquiring desirable properties for itself or its various clients. In December, 1909, two properties, known as the "Oberg" and "State" leases, were acquired and drilled for the Iroquois Company. Thereafter, in 1910, negotiations were pending for a number of other properties, including one known as the "C. M. Hill 40." This was ultimately taken over by the Rogers-Brown Company for the Iroquois Company on or about July 4, 1910. Indications were that the ore body in this tract extended to the east upon 80 acres of land owned by one Jacobson, for whom one B. Magoffin had acted as agent. Ore had been proved up on both sides of this tract, and it was recognized by Tripp and Kruse as of probable value for mining purposes, and especially in connection with the Hill 40, for which negotiations were pending. On May 21st Tripp wrote to Kruse as follows:

"Magoffin tells me that the 40 to the east (of the Hill 40) has the surface rights invested in some farmer. It would be our idea to control this, not only for the location, but in order to get a half hitch on the ore that will be run off the Mattson (Hill) to the east."

To this Kruse replied by letter of May 23d:

"I shall look into the matter and see if we can tie up the party who owns the surface right to the east."

The ore body, as distinguished from the surface, was at that time owned by the appellant Pine Tree Manufacturing Company, a Weyerhaeuser corporation. Appellee Kruse testifies that on or about the 21st day of May he talked with the agent Magoffin about acquiring this 80 acres of land. Magoffin told him he could get one 40, but would have to see another party before reporting finally upon the entire 80; that it had been about a year since he had had any negotiations with this party, and that he did not know how to approach him. Kruse said: "B, I am looking for a home location. You might mention that." He (Magoffin) said: "That is a good idea." Magoffin said the land would cost from $20 to $25 an acre. Kruse said he would take it for anything up to $30 an acre. It is the contention of Kruse in the present controversy that he had conceived the independent plan of acquiring this surface to be platted for town-site purposes, and not as a mining proposition in connection with the operations of his principal, the Rogers-Brown Ore Company. However this may be, he immediately wrote to Tripp the letter of May 23d, from which quotation has been made. Kruse further testifies that on May 27th Tripp visited Deerwood; that he told Tripp of his conversation with Magoffin and said:

" 'Mr. Tripp, if the company wants this thing, they are welcome to it for exactly what I bought it at.' Tripp said, 'Kruse, the company doesn't want it at all. I'll tell you what I'll do, I'll handle it for a half interest; we will go halves on it.' I said, 'All right, Mr. Tripp; go ahead.' I had a talk with him after dinner that day; as I recollect he came into the office about a quarter past 1; was there a very little while, and said, 'Kruse, I have got to split that thing up into thirds before I can handle it.' I said, 'All right, Mr. Tripp; go ahead.' He said, 'I have got to handle it through

the Soo Railroad.' Think that he came in the office the next morning, only there a short while and said, 'Kruse, I have got to split this up into fifths before I can handle it.' I looked at him and I said, 'All right; if you can't do anything else, go ahead.' "

The outcome was that this surface was finally purchased on July 8, 1910, and title was taken by Kruse, who gave his check for $1,652.50 in payment. Shortly thereafter Tripp arranged a sale to the Soo Railroad for $6,400. Kruse made a deed to the railroad, received the full purchase price, deducted the moneys advanced by him, and remitted the balance to Tripp to be employed pursuant to their under-standing. Thereafter, or, perhaps contemporaneously, negotiations were carried on with the Pine Tree Manufacturing Company for the lease of the mineral rights beneath the surface. That company was disinclined to give mining leases, and was further hampered in the control and disposition of its ore because it did not own the surface above it. The Soo Railroad was led to acquire this surface in order that it might secure a right of way over it, and, what was of equally great importance, a control of the transportation of ore from the mines when developed. Tripp, exercising the leverage of his control over the surface, succeeded in procuring a favorable option for lease from the Pine Tree Manufacturing Company, upon securing for them title to the surface, subject to the right of way of the Soo Railroad over that surface. The railroad was, of course, to have all ore shipments from the mine or mines thus to be developed. Coincidently, October 27, 1910, Tripp procured from the Pine Tree Manufacturing Company an agreement or contract whereby one-fifth of the net profits received by the latter company from the lands, by lease or otherwise, was to be paid by the Pine Tree Company to him. After the necessary development work, the lease, thus contracted for, was taken by the Iroquois Company, for which company, in fact, it had been intended from the outset. The latter company was, of course, ignorant of the contract for rebate between the Pine Tree Manufacturing Company and Tripp. The royalty named in this lease was 50 cents per ton.

Of these latter transactions between the Pine Tree Company and Tripp culminating in the lease to the Iroquois Company, the appellee claims he had no knowledge. He had turned the entire matter over to Tripp, he says, to work out a scheme for their mutual profit. The general nature of that scheme may be better understood by a brief recurrence to the testimony of appellee Kruse:

"A. I met Mr. Tripp at the station, and we walked over to the office, and when we got in the office I told Mr. Tripp that I got hold of that land, told him that I had the promise of it, and I told him about the value of the property.; the Soo was going to run their main line through the property, and there was ore proven up on both sides. Mr. Tripp said to me, 'Kruse, I will handle that deal for half interest.' I said, 'All right, Mr. Tripp; go ahead.' Q. And your ownership in the land at that time consisted in the statement by Mr. Magoffin that he would get it for you if he could? A. Yes, sir. Q. And therefore you told Mr. Tripp that he could go ahead and handle it, and that it was proven up on both sides, did you? A. Yes, sir, I did. Q. And did you tell him what it was valuable for? A. Yes, sir; for platting. Q. And what else did you say it was valuable for? A. I told him that we might put a few drill holes down and then take it up with the Weyerhaeusers and see

if we could not get a quarter interest in the mineral—something to that effect. * * * Q. Now, at some time or other during that interview on the 26th, during the 26th of May, during the entire time that you and he were talking about this thing, you did tell him and discuss with him that there was ore underneath this Weyerhaeuser 80, that it was proved up on both sides and known to be there, and that you could use this surface for the twofold purposes of surface purposes and also to get a pressure upon the Weyerhaeusers, who owned the ore underneath, to get a share in a royalty; is that right? A. I didn't say to use any pressure, Mr. Buckingham; no, sir. Q. Well, to get by use of this surface an interest in the royalty? A. The fact that ore was proven up on both sides doesn't say that ore was absolutely under the property. Q. Did you or did you not say to him that you could use this surface for the purpose of getting the Weyerhaeusers to give a royalty on the ore underneath it? A. I did not say that; no, sir. Q. Who did say that? A. Mr. Tripp said that. He didn't mention the Weyerhaeusers in it at all. * * * Q. Wasn't it agreed between you and him that this 80 acres of surface was to be used on your joint account, the two of you, for the purpose of getting royalties on the ore that lay underneath it? A. It was not from the Weyerhaeusers. Q. From whom? A. Well, he said he was going to handle the deal through the Soo Railroad. Q. Whom were you going to get the royalties from? A. I don't know whom he was going to get them from. He was doing big things up there, and he could handle big deals, and I knew he could handle pretty near anything he wanted to. Q. How did you understand that the possession of that 80 by you and by him was going to get royalties for you and him? A. He said so. Q. Whom did you understand he would get them from? A. I don't know whom he was going to get them from. Q. You didn't understand? A. No, sir. Q. You are a mining engineer? A. I am. Q. Been in the mining business a long time? A. Yes, sir. He didn't want me to ask him any questions; he was handling it. * * * Q. He said you and he would use that 80 of surface, and it would inure to get you 10 cents a ton, or 5 cents a ton anyhow? A. Yes. Q. The two of you, by the use of that 80? A. Yes, sir; he said that. Q. Out of what ore did you expect that royalty was going to come? A. Out of any ore that was underneath the property. Q. That is what I am trying to find out. The ore underneath the 80? A. That is right. Q. And he told you that at the time, did he? A. Yes, sir. Q. So that the agreement between you and him, made on the 26th day of May, at that conference, was that he was to take this 80 that you were going to acquire from Magoffin, and that you were going to handle it through the Soo Railroad, or some other way—he was? A. Yes, sir. Q. And the result of that handling was going to be that there would be a 10 cent or 5 cent royalty acquired in the ore that lay underneath the 80? A. Yes, sir. Q. And that you and he were going to divide that royalty? A. That is what he said. Q. That was the object of the partnership, was it? A. Yes, sir. Q. You and he went into partnership for the purpose of getting that royalty out of that ore? A. That is what he said; yes, sir. Q. Correct. Now, you said to him, when he spoke to you there, 'I got the surface to that land,' as I understand you. Was that the language you used to him? A. I do not recall the particular language. Q. Well, you didn't just say to him, 'I got the surface to that land,' did you? A. I probably mentioned that Weyerhaeuser 80. Q. Well, he didn't know anything about the Weyerhaeuser 80 before that, did he? He didn't know anything about that surface, did he? A. He had written me about it. Q. He wrote you on the 21st about it? A. Yes, sir. Q. And you wrote back on the 23d and said you would get it— A. Yes, sir. Q. —in connection with this company matter? A. Yes, sir."

According to Kruse, the entire agreement between him and Tripp was made on May 26th. It will be remembered that the transaction by which they acquired the surface through Magoffin was not closed until the 8th of July. It is the contention of appellee that be bought the surface on his own account, and not as a company matter; that his status in this respect was fixed by his agreement with Tripp on

May 26th, and his previous dealing with Magoffin. Some later correspondence has a bearing upon the bona fides of this contention. June 6, 1910, Kruse wrote Tripp a letter in which the following occurs:

"Your letter of the 4th inst., at hand. I am very glad, indeed, to learn that you have taken over the C. M. Hill 40. * * * You will see that it will be necessary for us to get the 40 east of the C. M. Hill 40 (part of the tract in question) in order to stock our ore. * * * I shall call up Magoffin and see what he has done in regard to getting the surface on the Weyerhaeuser 40 to the east. If he hasn't done anything as yet, I shall send Pete Larson after it and see what can be done. I know that he will buy it, and buy it cheap, for us."

And, again on June 10th, in a letter to Tripp, Kruse says:

"I spoke to Mr. Magoffin yesterday and he advised me that they could get the surface right to the 40 east of the C. M. Hill 40, for about $21 per acre. If the company does not care to buy this, I would like to go in with you and take a 1-3 interest."

Kruse's explanation of the latter statement is that, although the agreement between himself and Tripp had been consummated, he wrote this letter in an attempt to get from Tripp a larger percentage than the one-fifth which had been finally agreed upon. Six days later Tripp wrote Kruse as follows:

"Minneapolis, Minn., June 16, 1910.

"Dear Kruse: In regard to the Warehauser 80 in 11-46-29. I have explained the value of this piece to the Soo as a (mean) of possibly getting the ore in the future.

"I have also explained that you have (bot) it personally as a speculation but that I (thot) I could get you to sell it at 50.00 per acre cash. The deal is satisfactory subject to the title of the surface being O. K.

"Now, you don't know me in the matter at all. But if the title is O. K. buy the piece at 21.00 or thereabouts, and have the abstract (brot) down to your name. Having the deed carried in the bank.

"When this is done send the abstract to H. B. Dike—General Solicitor Soo, Minneapolis. Also white him a letter stating that Mr. Tripp has requested you to give them the refusal at 50.00 per acre. And also say that if the title is satisfactory to them you will send the deed to any bank in Minneapolis attached to sight draft.

"I think this is a good deal for them and they will take it if the title suits.

"I have had to split this up some but you are in for 1-4 of profits. The company does not want it at all but will lease part for houses for $1. per yr.

"Remember in writing this is a personal deal of *yours*.

"Hope you can attend to the abstract at once.

"Please (distroy)                     C. D. Tripp."

It will be remembered that the surface was actually turned over to the railroad at $80 per acre.

Active exploration and mining operations on this tract began in the fall of 1910; the Rogers-Brown Company conducting the same, as usual, for the Iroquois Company under the direction of Kruse as superintendent. The formal lease was executed January 19, 1911. A year or more later it was accidentally discovered by the Iroquois Company that Tripp was receiving one-fifth of the royalty paid by it to the Pine Tree Company. Kruse testifies that he himself had not known it prior to that time. He says that he had no knowledge of the arrangements made by Tripp in connection with the sale of this surface, and had made no inquiry concerning the terms of disposition of the

property, to the proceeds of which he now lays claim. He saw Tripp about it in March, 1914, and demanded his share. Tripp offered what Kruse regarded as an inadequate settlement, and refused. In the disagreement which resulted, Tripp warned Kruse that if they fell out about the matter, both would lose all. Kruse replied:

"* * * 'If we go to lawing about this, they will get your interest all right, but I will get mine.' Q. Why did you tell him that, Mr. Kruse? A. Well, because— Q. That the Iroquois would get his interest but would not get yours. A. Because I knew I had put it up to the company and offered it to the company. Q. Well, why did that influence you in the statement that if they went to law about it that the Iroquois Iron Company would get Tripp's interest back but would not get your interest? A. Because I knew that he was connected with the company. Q. You knew he was connected with the company at the time? A. Yes, sir. Q. And you figure that so far as Tripp was concerned, or you believed that so far as Tripp acquiring this interest was concerned as against the Iroquois Iron Company, that they could get it back? A. That is what I supposed they probably would, yes, sir. Q. You figured that at the time that Tripp got his interest in this 10 cent royalty that he was doing it unbeknown to the Iroquois Iron Company? A. No, I can't say that I did; I don't know whether he did or not. Q. Then just what did you mean when you said to him that, 'They can get your interest back but they can't get mine if we go to a lawsuit about this matter'? A. Well, he was president of the Rogers-Brown Ore Company, and I figured the president could not get away with a thing like that very well. * * * Q. He was president of the company? A. Yes, sir. Q. And you were superintendent of the company? A. Yes, sir. Q. You were working there for the Rogers-Brown Ore Company as superintendent? A. Yes, sir. Q. The Rogers-Brown Ore Company and the Iroquois Iron Company, the stockholders were mixed up a good deal together? A. So I understood; yes, sir. Q. In the month of June, 1910, the Rogers-Brown Ore Company was drilling this property and exploring it for the Iroquois Iron Company? A. Yes, sir; they were. Q. And while they were doing that drilling and exploratory work you were the superintendent? A. Yes, sir. Q. And Mr. Tripp was the president of the Rogers-Brown Ore Company? A. Yes, sir. Q. I mean at the time that this exploration work was done. Mr. Tripp was the general manager of the Rogers-Brown Ore Company? A. Yes, sir. Q. And you were the superintendent? A. Yes, sir. Q. And you were working there under Tripp as superintendent? A. Yes, sir. Q. Doing this exploration work for the Iroquois Iron Company A. Yes, sir. Q. And subsequent to that exploration work, or about that time, the Iroquois Iron Company got this lease from the Pine Tree Manufacturing Company? A. Yes, sir. Q. The same being the mine or the mineral underneath the surface that is now in litigation? A. Yes, sir."

Later, appellant Crow Wing Land Company acquired all the interest of the Pine Tree Manufacturing Company in and to the property in controversy; and subsequently thereto Kruse brought suit in the state court against that company and Tripp, to establish a one-half interest in the contract by which Tripp acquired a one-fifth interest in the royalties paid by the Iroquois Company to the Pine Tree Company. The judgment of that court was in his favor. To this suit the Iroquois Company was not a party. The latter company made settlement with Tripp in which the royalties thus received by him were computed at $32,000, which sum, less $4,000, claimed to have been expended by him, he paid over to the Iroquois Company. He also assigned to that company all his rights under his personal contract with the Pine Tree Company. Thereupon, the Iroquois Company brought this suit against Kruse, the Pine Tree Manufacturing

Company, and its successor, the Crow Wing Land Company, to declare and enforce against the defendants a constructive trust in the benefits arising out of the instrument made by the Pine Tree Manufacturing Company to Tripp, as aforesaid. In this action the Pine Tree and Crow Wing Companies, by counter-claim or cross-bill sought to repudiate the contract both as against the plaintiff and their co-defendant Kruse, upon the ground that it is especially prohibited by the statutes of the state of Minnesota and is against the public policy of the state. The district court dismissed the bill of the plaintiff as without equity, and found the issues upon the counterclaim or cross-bill in favor of appellee Kruse.

[1] Some contention is made that, inasmuch as the appellant Iroquois Iron Company, by virtue of the assignment to it, was vested with full title to all Tripp's interest in the contract which formed the subject-matter of the suit in the state court, and might therefore have intervened in that suit and asserted its rights, it is now estopped by the verdict and judgment in that case. This contention is without merit. The Iroquois Company was not a party to the action in the state court, and could not be concluded by any judgment rendered therein. The determination of any rights existing between Tripp and Kruse could have no necessary effect upon this appellant. The required diversity of citizenship exists, and the Iroquois Company was entitled to have its cause heard by the court designated by the Constitution for the determination of controversies falling within its jurisdiction.

[2-4] There is little controversy with respect to the legal principles involved on the merits. Counsel are in disagreement chiefly as to their application to the facts in evidence. The rule has been comprehensively stated by this court in Trice et al., v. Comstock et al., 121 Fed. 620, 57 C. C. A. 646, 61 L. R. A. 176:

"Wherever one person is placed in such a relation to another by the act or consent of that other, or by the act of a third person, or of the law, that he becomes interested for him, or interested with him, in any subject of property or business, he is in such a fiduciary relation with him that he is prohibited from acquiring rights in that subject antagonistic to the person with whose interests he has become associated.

"A violation of this inhibition, and the acquisition by one of the parties, by means of interest or information acquired through the fiduciary relation of any property or interest, which prevents or hinders his correlate in accomplishing the object of the agency, charges the property thus acquired with a constructive trust for the benefit of the latter, which may be enforced or renounced by him, at his option.

"The test of such a trust is the fiduciary relation, and a betrayal of the confidence imposed under it to acquire the property. Neither a legal nor equitable interest by either party, during the relation, in the property subsequently acquired, nor authority in either to buy or sell it, nor damage to the party betrayed, nor the existence of the fiduciary relation at the time the confidence is abused, is indispensable to the existence and enforcement of the trust. The existence of the relation, and a subsequent abuse of the confidence bestowed under it for the purpose of acquiring the property, are alone sufficient to authorize the enforcement of the trust."

The doctrine announced in the foregoing extracts from the syllabus in that case is luminously stated and elaborated in the opinion of Judge

Sanborn, to which, for the underlying and convincing reasons supporting it, reference is made without further quotation. This court has many times announced and applied this rule of equity. Gunn v. Black et al., 60 Fed. 151, 8 C. C. A. 534; McKinley v. Williams, 74 Fed. 94, 20 C. C. A. 312; Singers-Bigger v. McCourt et al., 145 Fed. 103, 76 C. C. A. 73, 7 Ann. Cas. 287; Howe v. Howe & Owen Co., et al., 154 Fed. 820, 83 C. C. A. 536; Byrne v. Jones et al., 159 Fed. 321–323, 90 C. C. A. 101.

"The principle is applied, not only to the agent himself, but to subagents, clerks, and assistants appointed by him; and it extends also to his partner in business. Whatever disabilities the agent labors under attach equally to those whom he employs under him." Mechem on Agency (2d Ed.) § 1202; Ex parte Burnell, 7 Jur. 116; Gardner v. Ogden, 22 N. Y. 327, 78 Am. Dec. 192; Mitchum v. Mitchum, 3 Dana (Ky.) 260; Martin v. Moulton, 8 N. H. 594; King v. Remington, 36 Minn. 15, 29 N. W. 352; Rhett v. Poe, 2 How. 457, 11 L. Ed. 338.

The principle of the rule is stated to be that the fiduciary shall be under no temptation to misuse his power, his knowledge of the situation, and the confidence to which his position entitles him, to the injury of his principal, because if he may use these advantages of his position for the benefit of a relative, an employer, an employé, or a partner, it is idle to prohibit him from using them for his own individual advantage.

[5] The Rogers-Brown Ore Company was the agent of the Iroquois Iron Company. It received compensation for the work it did. It could acquire no rights against its principal in the subject-matter of its employment by virtue of knowledge or information obtained as an incident thereto, and this disqualification is equally impressed upon its employés, upon Tripp, its general manager, and Kruse, its general superintendent in the field. Concerning Tripp there is practically no controversy. In our opinion, the application of the rule to Kruse is equally obvious. He was another major employé, intimately associated with the very enterprise then under contemplation and development. This is true whether or not Kruse, the servant of the Ore Company, was fully informed as to the exact relationship between the Ore Company and its principal, whether or not he knew precisely the identity of that principal in the present transaction, or whether or not he knew all the details of the arrangements between the Ore Company and Iroquois Company. He was fully aware of the nature of the business of the Ore Company and the relation it sustained to the various companies, including Iroquois, forming the corporate organization of the Ore Company. He knew the nature of the work in which the Ore Company and he, as its representative, were engaged, and the record abundantly shows that he knew practically what was being done and sought to be done in the present instance.

[6] The point is raised that the Iroquois Company was seeking only to obtain mining property, that is to say, ore bodies beneath the surface; that it was not acquiring surface as such; that the acquisition of the Weyerhaeuser 80 did not come within the scope of the agency, and, therefore, that Kruse was at liberty to acquire this surface for himself. The same reasoning would apply, with equal force, to Tripp,

but it is sought to make a distinction between Tripp and Kruse in this respect, that Tripp knew the exact situation and used his knowledge in fraud of his principal; but even Kruse's own testimony, standing alone, establishes beyond dispute that before he acquired the Weyerhaeuser tract he knew that it was being acquired primarily not as a surface proposition, but as an important adjunct to the acquisition and uses of mines and mining.

Conceding to appellee Kruse the most favorable aspect of his negotiations for this tract, it is certain that he had not more than opened negotiations for its purchase before he received Tripp's letter of May 21st telling him to get control of this property for the use of the surface in connection with the mining operations on the Hill 40, and in order to secure what Tripp termed "a half hitch" upon the ore beneath that surface. He carried out his subsequent negotiations with Magoffin under these instructions. He made an arrangement, so he says, which was complete as to understanding, but with no legal effectiveness, on May 26, 1910. On that day he advised Tripp that he had practically secured the surface of this 80, that the company could have it, if it wanted it, and at that time he supposed the company wanted it. He had not yet paid out any money nor secured a valid and subsisting contract for title. Tripp then told him the company did not want this land, but Tripp told him that in a way that apprised him that the matter was to be handled illegitimately; that he himself was to become a party to the transaction; that the surface was to be turned over to the Soo Railroad, and a profit realized therefrom; that, nevertheless, it was to be used to secure a percentage of royalty upon the underlying ores in which Tripp and himself were to share equally; that all this must be kept secret, and that he (Kruse) must hold out that he alone was the real party in interest; that others must be seen and "fixed" by the splitting up of percentages. It is impossible to read this record and fail to perceive that these two men, employés of the Ore Company, which was itself the agent of the Iroquois Company, were then and there engaged in the perpetration of a deceit and fraud upon the common principal, and that, although Tripp may have devised the scheme, nevertheless Kruse willingly and unquestionably accepted it under circumstances inconsistent with his claim of bona fides.

[7] This consideration is in itself sufficient for the disposition of this appeal, but it is supported and strengthened, if need be, by another established proposition of law. It must be conceded that Tripp, in any aspect of the case, abused the confidence of both Ore Company and Iron Company, and that the interest he acquired was, in equity, held in trust for the principal. Kruse was admittedly a partner in this enterprise from its inception, whether with or without actual knowledge of all its details; but the knowledge of one partner is the knowledge of the other, and notice to the one is notice to the other. Rhett v. Poe, 2 How. 456-482, 11 L. Ed. 338. The partnership cannot profit by the act of a member in betrayal of the confidence reposed in the latter as a fiduciary.

[8] It is undoubtedly true that both Tripp and Kruse are nevertheless entitled to be reimbursed for the expense and outlay actually in-

curred and made by them for the benefit of the principal; the profit and advantage only inuring to the latter. The undisputed testimony is that, before remitting to Tripp, Kruse deducted and retained all moneys actually expended by him; that a balance of not more than $4,000 was turned over to Tripp. This, we may assume, was repaid by the latter to the Soo Railroad to acquire the title to the surface for the Pine Tree Company. If this $4,000 be regarded as a profit, and therefore the money and property of Kruse and Tripp, it was obviously realized by them as a part of the scheme in fraud of the principal. But, however this may be, this $4,000 was allowed to Tripp as expenses incurred by him in acquiring the property for the Iroquois Company. Kruse was his partner, and must look to Tripp for the satisfaction of any rights he may have in this respect.

It remains to consider the appeal of the Pine Tree Manufacturing Company and the Crow Wing Land Company. As has been stated, the latter company has acquired all the rights of its coappellant. It seeks to set aside the contract with Tripp because of some prohibitions in the statutes of the state of Minnesota affecting uses and trusts. In our opinion, those provisions are not applicable to the present situation. From the viewpoint of these appellants the Pine Tree Manufacturing Company made a valid contract of purchase of the surface in question, and in payment therefor, in writing, allowed to Tripp a certain interest in the profits to be received by it from the lands by lease, sale, or otherwise. The considerations which we have discussed disclose that the benefits of that agreement inure to the appellant Iroquois Iron Company under established principles of equity jurisprudence. The law applicable to the case steps in and executes the agreement, vesting in the beneficiary the rights to which, in accordance with those principles of equity, it is entitled. Those rights can be neither impaired nor extinguished by academic discussion nor excessive nicety in the matter of legal definition.

[9] Neither the Pine Tree nor the Crow Wing Land Company appear to have regarded the contract with Tripp illegal until the present complication arose. It is quite as valid for the benefit of the real party in interest as it was in the hands of the fiduciary. The Crow Wing Land Company, as the successor in interest of the Pine Tree Company, still retains the property it acquired—property in fact held in trust for the Iroquois Company—and cannot refuse to perform its agreement and pay the consideration. Its situation has not been changed to its disadvantage. It agreed, in substance and effect, to accept a net royalty of 40 cents per ton for its iron ore, and it matters little whether that royalty is paid at the flat rate of 40 cents, or at the contract rate of 50 cents, with a refund of 10 cents to the proper party. The result is the same.

The decree of the court below will be reversed, and the cause is remanded, with directions that a decree be entered adjudging that the appellant Iroquois Iron Company is, in equity, entitled, as against all the defendants, to the benefit of the entire contract of October 27, 1910, between the Pine Tree Manufacturing Company and Chester D. Tripp; that the appellee Kruse has no interest therein, nor any claim to the

benefits thereof as against the said appellant; that the Pine Tree Manufacturing Company and the Crow Wing Land Company shall respectively, according to their several rights and liabilities, pay to the said appellant all moneys due thereon either directly or by allowing it to deduct the amount from the rentals payable by appellant under said contract, as to the court may seem best adapted for the adjustment of the equities of the parties, and for such other and further proceedings, in conformity with the views herein expressed, as may be found necessary and proper.

It is so ordered.