### SABIN et al. v. BIERBAUM.

(Circuit Court of Appeals, Eighth Circuit. April 25, 1922. Rehearing Denied September 20, 1922.)

No. 5758.

**1. Principal and agent ⬅69(3)—Contract between principal and agents held void for fraud.**

Complainant was induced by defendants to agree to purchase certain mining property, then in the hands of the bankruptcy court, for $50,000. Defendants bought the property for less than $42,000, the initial payment of $25,000 being furnished by complainant, who was then induced by representations that defendants had been the means of securing the property at much less than its actual value, to sign a contract to advance $25,000 more for a half interest, the property to be purchased by a corporation organized by defendants and complainant to receive one-half the proceeds. Defendants divided between themselves $8,000 of the money received from complainant. *Held*, that defendants were complainant's agents in the purchase of the property and that the contract by which they were to obtain a half interest was without consideration and void for fraud.

**2. Trusts ⬅84—Agent holds title to property of principal in trust.**

An agent, who takes title in his own name to property paid for with money of his principal, holds it in trust for his principal.

**3. Principal and agent ⬅69(1)—Agent cannot use relationship to detriment of principal.**

An agent is required to work and act with an eye single to the interest of his principal, and cannot use the relationship to his own advantage and the detriment of his principal.

Appeal from the District Court of the United States for the District of Colorado; Jacob Trieber, Judge.

Suit in equity by Gerham H. Bierbaum against E. M. Sabin and others. Decree for complainant, and defendants appeal. Affirmed.

Edward M. Sabin and L. F. Twitchell, both of Denver, Colo., for appellants.

Con. K. O'Byrne and Geo. Q. Richmond, both of Denver, Colo., for appellee.

Before CARLAND, Circuit Judge, and YOUMANS and JOHNSON, District Judges.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

JOHNSON, District Judge. The parties will be referred to as they were designated in the court below. The plaintiff prevailed in that court, and in the decree entered in the cause the contract, dated November 14, 1918, between the defendant E. M. Sabin and the plaintiff, was declared to be void, and the plaintiff was adjudged to be the owner of the mining property situated in Gilpin county, Colo., known as the property of the Fifty Gold Mines Corporation, and the defendant Sabin, who held the legal title, was directed to convey the property to him. It is unnecessary to mention other provisions of the decree.

[1] In this court the defendants challenge the sufficiency of the evidence to support the decree. It is their contention that the evidence shows the contract of November 14th to be valid and binding upon the plaintiff. It is recited in the contract that the defendant Sabin had purchased the property from the trustee in bankruptcy of the Fifty Gold Mines Corporation, bankrupt, on the 9th day of October, 1918. In the contract he agreed to sell the plaintiff an undivided one-half interest in the property for $50,000. Payment of $25,000 is acknowledged. The balance of $25,000 was to be paid on or before the 1st day of December, 1918. The contract provides that the defendant Sabin shall take and hold the title to the property; that he shall convey it to a corporation thereafter to be organized for such price as may be agreed upon; that out of the first money paid by the corporation on the purchase price of the property plaintiff shall receive the sum of $52,500, which, it is recited, will reimburse him for the moneys contributed by him for expenses and working capital and paid to Sabin for his one-half interest in the property. It is further provided that the defendant Sabin shall receive the next $50,000 paid by the corporation on the purchase price of the property. The balance of the purchase price paid by the corporation it is stipulated shall be divided equally between the parties to the contract.

The real controversy between the parties at the trial was whether the contract of November 14th was only a modification of the original understanding between the defendant Larson and the plaintiff, freely entered into by the plaintiff, and made upon sufficient consideration, or whether it was not only different from the original agreement, but was without consideration, and evidenced an attempt on the part of the defendants to overreach and defraud the plaintiff. From the record we learn that the estate of the Fifty Gold Mines Corporation had been in the hands of the bankruptcy court since 1910. The trustee in bankruptcy had offered the property of the bankrupt for sale without success until October 9, 1918, when it was bought by the defendant Sabin. The circumstances leading up to the purchase of the property by him were these:

The defendants Larson and Naughton had long been acquainted with the property, and had at various times, acting separately, attempted to find a purchaser or to organize a syndicate to buy the property. In 1918 they joined in a common effort to that end, associating with them one Frank Marsh, who is not a party to the action. Later the defendant Sabin, an attorney at law, was associated in the joint venture. He

looked up the title of the property and took an active part in the trans-. actions which resulted in this litigation.

The plaintiff is a well-to-do farmer living in Cass county, Iowa. In August, 1918, defendant Larson was in Iowa, promoting the sale of the property and attempting to organize a syndicate to purchase it. While there he called upon the plaintiff at his home. The plaintiff, testifying of this visit, said:

"He showed me the book he had that had pictures in it of the machinery and mill; said he was going to get a company together, and would start out and take a look at the property. I agreed to go along with them. He said the property was of big value, and that the purchase price would not exceed $50,000."

On September 26, 1918, Larson and the plaintiff visited the property, and the plaintiff testified that Larson again told him that the property could be bought for not to exceed $50,000, "depending on what it could be bought for at the court." Plaintiff in his testimony, continuing, said:

"I thought, and so told Larson, it would be worth that; that I would go in and help to buy it."

The plaintiff and Larson returned to Denver, and in the evening went to the home of the defendant Naughton. The plaintiff, testifying of that visit, said:

"It was said they needed $5,000 for the first payment of purchase price of the property whenever it was sold. I wrote out a check, payable to Father Naughton, for $5,000, and told them to hold it until I got back to see whether the bank would honor it, and when I got back I telephoned them the bank would not honor it, and that it was not to be cashed. They told me it had to be cashed, because, if it was not, there would be contempt of court. Mr. Larson told me this over the telephone. Larson came up to my place in Iowa a few days after that. He said, 'We'll have to get the money together, so that check will be paid.' I borrowed the money from my brother, and the check was paid. There was a meeting called in Atlantic for some other parties to come and help get the balance of the money; but they did not, so I gave a mortgage on my homestead to get the money. First got $5,000. * * * I paid in all $50,300."

Referring to his visit to the mine on September 26th, plaintiff testified:

"I knew at that time that the property was for sale by the trustee in bankruptcy. I did not go to the bankruptcy court to make any inquiries, but knew it was in Denver. Knew the property had not then been sold, as that is what they told me; also that there was quite an amount of taxes on the property, but they were going to get that down to one-half. McNeill told me that at the mine."

The witness John McNeill, who is corroborated by his wife, testified that Larson and the plaintiff were at his home at Black Hawk (near the mine) on the 26th of September, and that Larson said, in the presence of himself, his wife, and the plaintiff, that the price of the property would not be over $50,000.

The defendants in their answer allege that:

"After the plaintiff had made such examination" (referring to the visit to the property on September 26th), "he entered into a verbal agreement with the defendant Larson, to the effect that, if said Larson and his associates

could make a purchase of said property from the trustee in bankruptcy, and would sell the same to the plaintiff, he would take said property at and for the price of $150,000, and advance as much as $50,000 as required to pay to said trustee upon the purchase price from the trustee. Thereafter defendants and Marsh arranged to purchase said property from said trustee in bankuptcy, and under such agreement between plaintiff and defendant Larson the plaintiff advanced to the defendants Larson and Naughton the sum of about $25,000, and further agreed with the said Larson to advance other money as required, and when the sale was completed, so these defendants could convey title to plaintiff, pay or arrange satisfactorily for the payment of the balance of said $150,000 purchase price, and also agreed that, from the time the purchase was made from the trustee in bankruptcy, he, the plaintiff, would take over said property and pay the expenses of the supervision, care, and watching of the same, thus relieving the trustee of such expenses, and directed said Larson to employ men to do certain work upon said property under the direction of said Larson, and agreed to advance whatever funds were necessary to pay for the labor and material so expended in such work."

### The defendant Larson testified:

"I knew the company was in bankruptcy. * * * About four years ago I started in to try to promote a pool to buy the property in, and then again about the 1st of August just prior to this last sale. * * * I think this present matter was first mentioned to Mr. Bierbaum [the plaintiff] some time in September. * * * Later I went to Mr. Bierbaum's home with Mr. Collins and Mr. Brown to advise him against the Hidden Treasure proposition, as we figured it was overcapitalized. At that time I showed Mr. Bierbaum in a general way the Fifty Gold Mines property on paper. * * * We then talked that we would put a price on it of $150,000. We didn't know at that time what it could be purchased for. We figured that we would have competition. Following that, and in September, I think, Mr. Bierbaum came out, and I went with him to look over the property. I think we were there twice prior to the purchase, but I am not positive, and I think we spent a day and night there, if I am not mistaken, about that time. This was to arrange to check up the property, surface conditions, and machinery, to see whether there was enough on the surface to guarantee whatever price it would bring."

### Again on cross-examination he testified:

"I think it was in September, prior to the sale, that I first went to Mr. Bierbaum's residence in Griswold, Iowa. At that time I had no serious intention of getting Mr. Bierbaum interested in the Fifty Gold Mines Company. I took along the photographs and pictures of the mine, because I had them with me. I had them, because we were organizing a pool there. * * * The first time Bierbaum and myself visited the property was after the conversation in September. We were not selling any interest in the property at that time. We were arranging to purchase the property, and to raise a pool and then sell it for $150,000. That was my plan. * * * I said I didn't know what competition we would have in the purchase; that was one reason we put it at $150,000 to Mr. Bierbaum."

### In answer to the question:

"Isn't it true that up to the 14th of November, 1918, when Mr. Sabin made out this agreement, that that was the first time it was ever disclosed to Mr. Bierbaum that he was to receive only a half interest in the property?"

### —he said:

"No; that is not true. Up to that time Mr. Bierbaum never figured on over one-eighth interest; that's all he ever figured on."

Except for the testimony of the defendant Larson, the verbal agreement alleged in the answer as above set out is without any substantial

support in the record, and his testimony is so uncertain, evasive, and contradictory that it was not possible for the trial court to reach any other conclusion than that the agreement and understanding was as testified by the plaintiff and his witnesses.

On the 9th day of October the defendant Sabin bought the property from the trustee in bankruptcy for $41,807.59, which he paid in installments with money advanced by the plaintiff, except the last payment of $4,000. The latter sum was borrowed from a Denver bank upon the joint note of plaintiff and defendants, secured by the property. It became necessary to borrow the money to make the last payment on the purchase price because, of the $50,300 advanced by plaintiff, $8,192.41, the difference between $50,000 and $41,807.59, the defendant Sabin had divided among the defendants and Frank Marsh, their associate in the joint venture, and in addition there had been paid out by him about the sum of $4,000 on account of expenses incurred on the property and by the defendants personally for which they claimed and received reimbursement. The rights of the parties respecting these moneys are determined in the decree and require no special notice.

The trial court found that the defendants were plaintiff's agents in the purchase of the property and that the understanding between the plaintiff and Larson was that the plaintiff was willing to give as much as $50,000 for the property, and Larson was authorized to buy it from the bankruptcy court for as much less as possible—the difference between $50,000 and the actual purchase price to be retained by Larson as remuneration for his services. Under the evidence the defendants cannot justly complain of this finding of the court.

[2] It is elementary that an agent who takes title in his own name to property paid for with the money of his principal holds it in trust for his principal. Walker v. Bruce, 44 Colo. 109, 97 Pac. 250; McPherrin v. Fair, 57 Colo. 333, 141 Pac. 472; 1 Perry on Trusts, § 127. And Sabin, Larson's associate, is in no better position than Larson would have been, had the title to the property been taken in his name. Iroquois Iron Co. v. Cruse, 241 Fed. 433, 154 C. C. A. 265. If the defendants have any interest in this property, they have it by virtue of the contract of November 14th, and not because of the alleged agreement set up in their answer.

[3] But the law "imposes a duty that the servant shall be faithful to his master, the attorney to his client, the agent to his principal, the trustee to his cestui que trust, that each shall work and act with an eye single to the interest of his correlate, and that no one of them shall use the interest or knowledge which he acquires through the relation so as to defeat or hinder the other party to it in accomplishing any of the purposes for which it was created." Trice v. Comstock, 121 Fed. 623, 57 C. C. A. 649, 61 L. R. A. 176; Byrne v. Jones, 159 Fed. 321, 90 C. C. A. 101.

Keeping in mind that the defendant Larson, and through him the other defendants, were plaintiff's agents to purchase this property, for which he was to pay a sum not to exceed $50,000, the agents to retain as compensation the difference between that sum and the amount actually paid for the property—it is not difficult to determine that the

legal principles applied in the cases above cited are applicable to the facts of this case. The testimony of the plaintiff is lacking in details as to what occurred when the contract of November 14th was executed. We learn from his testimony, however, that the contract was drawn and executed in the office of the defendant Sabin, and that the defendant Larson was there present with them; that Sabin and the plaintiff talked over the agreement for an hour or so before it was signed. The plaintiff testified:

"Mr. Sabin said, 'I understood that you have mortgaged your home, that you are in the way of under a burden, and by getting into this deal here we will get the money out, so you can pay back your mortgage out of that,' and he said that I would save what I had already paid. I had then paid $25,000."

He also stated that he had never agreed to finance the proposition for $150,000. He testified:

"They told me this property cost $150,000, and they was instrumental in getting it down to $50,000, and that was why they was in for the half interest, because they put it down from $150,000 to $50,000. I was not talking of taking the whole property for $150,000. * * * They told me they got it down from 150 to 50, and that is why they were entitled to a half interest. * * * I expect there was something then said about the organization of a corporation for $1,000,000 and to sell stock, and we would both be getting our money out of it."

It is from the testimony of the witness Sabin, whom the trial court exonerated of any intentional and willful attempt to deceive the plaintiff, that we get an intelligible statement of the understanding between the promoters and of what took place in his office on November 14th, when the contract was signed. He testified:

"As to securing title to the property, the arrangement made was that we [the promoters] should bid this property in as cheaply as we could at the bankruptcy sale, and that I should bid it [in in] my name as trustee for the benefit of Mr. Larson, Mr. Naughton, Mr. Marsh, and myself, and then sell the property to whomever we might make a deal with. * * * I couldn't say exactly when I first heard of Mr. Bierbaum, but it was about the time of the sale, one of these sales that were had. I was advised by Mr. Larson that he had made arrangements with Mr. Bierbaum to sell the property to him, and Mr. Bierbaum had agreed to make certain advances. * * * The information I had was that Mr. Bierbaum was negotiating with other parties to raise the money to buy the property at $150,000; that he had taken it up with Messrs. Brown & Brown, neighbors or friends of his, or acquaintances, in Iowa, and that he was to buy the property for $150,000. * * * I think I met Mr. Bierbaum a day or two prior to drawing the agreement of November 14th, and talked with him about the property, and that the plaintiff said he considered the property worth many hundreds of thousands of dollars; that there was lots of money in it and he was anxious to go ahead. I then ascertained something about his financial condition. * * * He told me at that time he had mortgaged some property of his to raise the money, and that he didn't know as he could handle it at $150,000. I said, 'Mr. Bierbaum, if you are going to have any difficulty in financing this—I know nothing of your finances, or your financial ability; but you are not a mining man, as I take it, and,' I said, 'it costs money to begin. Now, if you are going to have any difficulty, we ought to make some other arrangement.' He asked me what I had to suggest. I suggested to him the proposition that for $50,000 he take a half-interest, and that we organize a corporation, he having a half interest in the proposition and my associates and myself a half interest, and to work to-

gether to either sell bonds on the proposition or to sell stock in the matter. * * * We talked over the matter very thoroughly, and he said then, 'If this is the arrangement, if I do this, I won't have to put up over $50,000.' I said, 'That would pay for your half interest in the property.' He said that would please him very much better, because it might embarrass him to raise $150,000, but he could raise the $50,000. So we talked it over. I had already talked it over with my associates, and I had in mind, and suggested to him, already, before I talked with him on the 14th, because I had gone over it with my associates, and we all felt that he could not raise $150,000, and that he might lose his money if he did, because he might go in deeper than he should. This was the plan suggested as the way to protect him and protect us in the purchase of the property. So I called the stenographer in, and in the presence of Mr. Bierbaum I dictated the agreement."

It is perfectly apparent from the testimony above quoted that the plaintiff, who had an agreement with Larson to purchase this property for the sum of $50,000, was taken to the office of the defendant Sabin, who had been previously informed by Larson that the plaintiff had agreed to purchase the property for $150,000, where the pretended agreement was stated by Sabin in the presence of Larson and the new arrangement suggested by Sabin reduced to writing, and the plaintiff induced to sign the agreement by the representations of his agents that only by so doing could he expect to save the investment which he had already made—representations by which they acquired a half interest in the property without contributing one dollar of the purchase price.

The facts of this case illustrate the methods of the unscrupulous, who, avoiding a definite understanding or written agreement, first financially involve the unsophisticated, and then, by the assertion of a pretended agreement or understanding, take unconscionable advantage of the victim.

The other assignments of error are without merit.

The trial court did not err in the decision of the case, and the judgment is affirmed.